HIGGINS, Justice.
 

 The Mercantile National Bank at Dallas, via executiva, foreclosed on its mortgage against J. Thos. Driscoll, Inc., and sold thereunder six mineral leases affecting certain acre lots and the wells and the equipment thereon, located in the Pyron Subdivision, Caddo Parish, Louisiana.
 

 Prior to the sale, The Continental Supply Company filed an intervention and third opposition, alleging that it had sold, furnished, and delivered oil well materials and supplies in connection with the drilling and the operation of wells in search of oil and gas under the mineral leases covering and affecting a number of acre lots in the Pyron Subdivision, amounting to the sum of $4,927.78, which amount it claimed and filed a lien therefor. It prayed that its lien and privilege as a furnisher of materials and supplies on the six leases, the several wells and the equipment in connection therewith, be recognized as superior in rank to the mortgage of the Mercantile National Bank, and that the sheriff be ordered to retain, in his hands, the proceeds of the sale of the property, subject to the final judgment of the court. The order was signed before the sale was effected and the proceeds thereof amounting tb $20,550 are in the custody of the sheriff.
 

 The Mercantile National Bank, in its answer to the petition of intervention and third opposition, denied the existence of any lien or privilege in favor of the Continental Supply Company as a furnisher of materials and supplies, and demanded strict proof of its claim. The bank further pleaded that it had paid the Supply Company certain amounts in extinguishment of recorded oil assignments out of the funds realized from granting the mortgage in favor of Driscoll, Inc., and that, therefore, the Supply Company was
 
 *940
 
 thereby estopped to assert a materialman’s lien on the property for materials on open account.
 

 The district judge, in a written 'opinion, rejected the Supply Company’s demands on the ground that it had not properly -filed its asserted lien under the provisions of Act No. 145 of 1934, because only one lien, in globo, had been filed covering the materials furnished to the six different leases and the several wells in connection therewith, whereas, the provisions of the statute require the materialman to file a separate lien against each particular lease for the amount of materials and supplies furnished to such lease, and not just one lien against all of the leases. The intervener Supply Company appealed.
 

 The Pyron Subdivision contains eighty-three acre lots and comprises the East Half of the Southeast Quarter of Section 10, Township 20 North, Range 15 West, Caddo Parish, La., as appears from the plat or survey of the land. J. Thos. Driscoll, Inc., secured six mineral leases covering all of the Pyron Subdivision with the exception of lots 21, 41 and 82, as follows':
 

 1. The Mears and Rogers lease covering Lots 22 to 40, inclusive, and Lots 61 to 81, inclusive, and Lot 83.-
 

 2. The Keller lease covering Lot 43.
 

 3. The Mathieu lease covering Lot 44.
 

 4. The Schaeffer lease covering Lots 1 to 10, inclusive. -
 

 5. The Satellite Oil Company lease covering Lots 11 to 20, inclusive.
 

 6.The Lorch lease covering Lot 42 and Lots 45 to 60, inclusive.
 

 J. Thos. Driscoll, Inc., was the owner of and operated seven wells under the PyrOn Subdivision leases. Between May 5, 1938, and December 7, 1938,' The Continental Supply Company furnished materials and supplies for the drilling and operation of tifíese wells. The record contains the original vouchers showing that the materials and supplies sold to J. Thos. Driscoll, Inc., by the Supply Company, on open account, were charged to Moudris Oil Company, as was authorized. C. L. Vickers of the Supply Company and W. R. Gottshall, salesman, testified that these itemized documents correctly reflected the account due by Moudris Oil Company for the benefit of J. Thos. Driscoll, Inc. The vouchers also show that the deliveries were made to Del Cryer and W. F. Cryer, employees of J. Thos. Driscoll, Inc.
 

 Del Cryer testified that he was the field superintendent of Driscoll, Inc., and that he was authorized by that corporation to make the purchases for it on the account of the Moudris Oil Company; that the supplies were received at the store of the Continental Supply Company on Lake Street and were taken to the warehouse of Driscoll, Inc., on the Pendar lease, which adjoined the Pyron Subdivision leases. Del Cryer and W. F. Cryer identified a group of vouchers marked “No. 4,” which bore their signatures, and they stated that these vouchers correctly showed delivery of the supplies and materials to the various wells. From their testimony
 
 *942
 
 and the vouchers the amounts appear to be as follows:
 

 Satellite well No. 1 located on Lot 20...................... $ 277.33
 

 Satellite well No. 2 located on Lot 18...................... 561.08
 

 Self well No. 2 located on Lot 39 289.37
 

 Self well No. 3 located on Lot 22 616.26
 

 Self well No. 4 located on Lot 25 928.92
 

 Keller well No. 1 located on Lot 43 .......................... 196.52
 

 Mathieu well No. 1 located on Lot • 44 .......................... 196.53
 

 Total amount of materials delivered and used in the wells on the Pyron Subdivision leases............. $3,066.01
 

 The Supply Company, being unable to prove the sale and delivery of materials and supplies in excess of $3,066.01, which were actually used on the wells located under the leases in the Pyron Subdivision, has no claim or lien except for that amount. The map filed in evidence shows the lot location of the respective wells under the leases in question.
 

 On November 16, 1938, J. Thos. Driscoll, Inc., executed a mortgage under the provisions of Act No. 232 of 1910 in favor of the Mercantile National Bank at Dallas in the sum of $50,000 payable in monthly installments of $4,500, covering the six leases in question (which leases are admitted to be correctly described in the act of mortgage) and the equipment owned by J. Thos. Driscoll, Inc., in the Pyron Subdivision.
 

 On December '31, 1938, the Supply Company filed a lien under Act No. 145 of 1934, in the Mortgage Records of Caddo Parish, the pertinent part of which reads, as follows:
 

 “That the Continental Supply Company sold, furnished and delivered materials and supplies to the Moudris Oil Company and J. Thos. Driscoll, Inc. both doing business in Louisiana, in connection with the drilling and operation of oil and gas wells on those certain leases covering and affecting the following described property, to-wit:
 

 “The Pyron Subdivision of the East Half of the Southeast Quarter (E% of SE14) of Section Ten (10), Township Twenty (20) North, Range Fifteen (15) West, Caddo Parish, Louisiana.
 

 “That the amount due for said materials and supplies furnished and used on said leases, as shown on the itemized statement hereto annexed and made part hereof, marked ‘Exhibit A’ is the sum of $4,927.78,- which amount is wholly due and unpaid and bears interest at the rate of six per cent per annum, from the respective dates of the invoices until paid.”
 

 On February 25, 1939, a little over three months after the execution of the mortgage by J. Thos. Driscoll, Inc., the Mercantile National Bank instituted foreclosure proceedings, advertising the leases and equipment for sale at public auction on April 19, 1939, on which date the property was adjudicated to Ben F. Read for the sum of $20,500 cash. In the meantime (on March 29, 1939) the Supply Company obtained a judgment upon the open account against Moudris Oil Company and J. Thos. Driscoll, Inc., in solido, for the. sum of $4,928.78, with
 
 *944
 
 6% per annum interest, upon monthly-bills rendered.
 

 The provisions of Act No. 145 of 1934 relevant to the issues herein are as follows :
 

 “Section 1. * * * That any person, firm, corporation or association of persons who shall * * * furnish any fuel, drilling rigs, standard rigs, material or supplies whatsoever for or in connection with the drilling of any well or wells in search of oil, gas or water, or for or in connection with the operation of any oil, gas or water well or wells, shall have a lien and privilege on such oil, gas or water well or wells and the lease whereon the same shall be located, and on all drilling rigs, standard rigs, machinery, appurtenances, appliances, equipment, buildings, tanks and all other structures thereto attached for drilling, equipment and operation of such well or lease * * *.
 

 “Section 2. If a notice of such claim or lien, setting forth the nature and amount thereof, is filed for record and inscribed in the mortgage records of the parish where said property is located * * * in the case of furnishers of fuel, material or supplies, within sixty (60) days from the last date of the delivery of such fuel, drilling rigs, standard rigs, material or supplies to said well or wells, * * ‡
 
 i3
 

 It appears that there are two lines of authority on the question of whether a single recorded notice of a lien is sufficient to preserve a materialman’s lien or privilege on contiguous lots. The following statement from 10 A.L.R. 1026, and 75 A.L.R. page 1328, is copiously annotated:
 

 “The great weight of authority is to the effect that where labor is performed or materials furnished under one contract and for one owner, for two or more buildings located on distinct but contiguous lots, a single mechanics’ lien may be filed against all the buildings.”
 

 Laws in pari materia may be considered together for the purpose of interpreting and construing them. City of Shreveport v. Urban Land Company, Inc., 177 La. 357, 148 So. 256.
 

 In the case of Cox v. Rockhold, 14 La. App. 170, 128 So. 702, 705, the Court of Appeal of the Second Circuit, in holding that the plaintiff’s mortgage was inferior in rank to the lien, stated:
 

 “Rockhold’s contract with Gable called for the plumbing of ten houses, and the contention is made that the work on each house should be considered as a separate contract, and that the privilege on the first house was lost because the claim was not recorded within sixty days. We again quote the district judge and approve his ruling: ‘In the case at bar there was but one contract and transaction between Gable and Rockhold, and in this one transaction a blanket contract was entered into for the plumbing of all ten of the houses Rockhold had planned to build, and did build. The lots were a part of one plot of ground divided only by an imaginary line separating the residences and the lots on which they were built from each other, they all belonged to Rockhold, who was himself doing all the building, and the same character and extent of work was to
 
 *946
 
 be done in each and every one of the ten residences. The fact that the plumbing was contracted for at the rate of two hundred and thirty-five dollars per house, aggregating twenty-three hundred and fifty dollars, did not constitute ten separate contracts, independent and distinct from each other. Gable’s contract was not completed and exigible until every one of the ten houses had been plumbed in good and workmanlike manner, and the plumbing in every one of the ten houses was functioning properly.’
 

 “Counsel cite the case of Crowley Lumber Co., Inc., v. Plaffer et al., 4 La.App. 606. The case is not in point. In that case there were two houses owned by different persons and two separate contracts. The court said: ‘But the evidence does not show how much of the building material went into Dr. Plaffer’s building, nor how much into Mrs. Bonnette’s building’; and: ‘The ownership of the defendants being separate, the privilege provided by the law, C.C.Art. 3249, cannot be in solido.’
 

 “They also cite the case of Favrot Supply Co., Inc., v. U. S. Fidelity & Guaranty Co., 168 La. 841, 123 So. 593. The distinction between that case and the one at bar is marked. The court found: ‘There are two separate and distinct contracts for the construction of two separate and distinct buildings, each contract covering its own particular building, described and referred to therein. The two contracts were entered into by the Sixth District Building & Loan Association for the account of two of its borrowers; each contract being for the benefit and advantage of a separate and distinct borrow-
 

 In the case of Central Lumber Company v. Schroeder, 164 La. 759, 114 So. 644, 645, the plaintiff brought an action to enforce a building lien amounting to the sum of $3,-105.98, as a furnisher of materials on lots Nos. 1, 2, 3 and 4 of Block 11 of the Queens-borough Annex Subdivision of the City of Shreveport. Defendant denied that the plaintiff had a lien on all of the property. The mortgage creditor intervened, claiming a mortgage of $3,500 on Lot No. 1, and the purchaser of Lot No. 1 from the defendant, also intervened and opposed the alleged lien on that lot. It appears that the defendant by employing day labor (there being no building contract) and ordering the materials from the plaintiff, on open account, erected a residence and a garage on Lot No. 1. When the buildings were about completed, the defendant concluded that she might sell Lot No. 1, and began the erection of a two-story building to serve as a combination garage and dwelling on Lot No. 2, the plaintiff also and in the same manner furnishing materials for that purpose. After these buildings were erected, plaintiff furnished the defendant with materials used in fencing lots 2 and 4. When the residence on Lot No. 1 was completed, the defendant borrowed $3,500 from the Prudential Life Insurance Company and the mortgage was promptly recorded against Lot No. 1 and the improvements thereon. Two weeks later, the defendant granted the plaintiff a second mortgage securing notes for the sum of $1,472.85, in settlement of certain materials furnished, and this mortgage was also recorded. Five days thereafter, defendant sold Lot. No. 1 with the
 
 *948
 
 improvements to Roger Lawson, intervener, and the sale was recorded on the same day. The following day, the plaintiff recorded in the mortgage records his one claim for a lien against Lots 1, 2, 3 and 4, treating the.four lots as a single piece of property, and the furnishing of materials for their improvement as a single transaction.
 

 In holding that the lien and privilege was legal and that it primed the Prudential Life Insurance Company’s mortgage, and Lawson’s rights, the court said:
 

 “The cáse presents several questions for determination. One of these is whether defendant’s transactions with plaintiff with reference to the furnishing of material for the erection of the residence, the combination garage and dwelling, and the fencing of lots 3 and 4 were separate and distinct transactions, or whether they constituted a single continuous transaction for the improvement of what was considered a single piece of property, consisting of four lots, and not as the furnishing of material for distinct improvements on separate pieces of property. The determination of this question assumes some importance, especially, among other things, in view of the date on which plaintiff recorded proof of the privilege, which it claims. • In our view the furnishing of the material should be viewed as one continuous transaction for the improvement of a single piece of property. Prior to the burning of defendant’s home, which caused her to rebuild, the four lots were occupied by her as' her home, were generally referred to as her home place, and seem to have been treated as one piece of property in prior dealings between plaintiff and defendant. The combination garage and dwelling is properly viewable as an adjunct of the dwelling proper, and, as constituting, with the fencing, a part of one improvement. We shall therefore view the furnishing of the material as one continuous transaction for the construction of a single improvement.”
 

 The court concluded that the lien had been filed within the thirty-day prescriptive period from the completion of the entire work, as contemplated by law, the materials having been furnished continuously within twenty days before the recordation of the lien. It was also held that the plaintiff, in accepting the second mortgage, had not waived his lien and privilege due to the fact that the condition upon which the second mortgage was accepted, i. e., the payment of certain cash by defendant, had not been carried out by her and that the plaintiff had not made the slightest representation to either of the intervenors that he had waived any rights that he might have had to a privilege on Lot No. 1.
 

 Section 2 of Act No. 145 of 1934 requires that “ * * * notice of such claim or lien, setting forth the nature and amount thereof, * * * ” be “ * * * filed for record and inscribed in the mortgage records
 
 * *
 
 *It is clear that the act does not contemplate that there, should be anything sacramental in regard to the nature and the amount of the claim, but it merely fixes the manner of filing the notice of claim and limits the lien to the amount claimed in the recorded notice, and thereby gives notice to third persons that a lien is
 
 *950
 
 being claimed against certain property in a certain amount.
 

 The Second Circuit Court of Appeal, in •the case of Central Lumber Co., Inc. v. Douglas, et al., 12 La.App. 680, 127 So. 43, 45, in dealing with a similar provision under the building statute, stated:
 

 “As stated, however, the statute does not provide that the affidavit shall be made by the claimant, and must contemplate that it may be made by another; neither does the statute provide what shall be the form or substance in which the claim of lien or privilege shall be drafted,
 
 and we assume that the only object to be attained is'notice to the person who is sought to be held personally responsible for the claim, and to give notice to persons who may deal with the owner that a privilege is claimed on the property;
 
 and we think those objects were fully attained by the service and registry made in the present case.” (Italics ours.)
 

 In Central Lumber Co. v. Whittington, et al., 12 La.App. 695, 127 So. 79, 80, the Court of Appeal, Second Circuit, said:
 

 “The instrument recorded in the present instance, asserted an indebtedness against T. P. Whittington for material used in improving certain described property which was owned by T. P. Whittington, and on which the law granted a privilege for the security of the debt,
 
 and we are of the opinion that anyone dealing with Whittington with reference to the property and reading the records and the instrument recorded would be placed on notice that a lien and privilege was claimed on the property, and the object and purpose of the registry being. to give notice, the registry of the instrument was sufficient.”
 
 (Italics ours.)
 

 In the case of Benson v. Wilkinson, et al., 142 La. 273, 76 So. 711, 712, this court held that:
 

 “The object of registry is notice
 
 and a written declaration duly sworn to, showing the nature of the claim, the amount thereof, and indicating the purpose of its registry to be the preservation of a lien against certain described property, is a full compliance with the provision of Act 221 of 1914, requiring every person having a claim against the undertaker to record a sworn statement thereof.” (Italics ours.)
 

 The statute in question, Act No. 145 of 1934, provides no particular form for the filing of the lien, nor does it require that the claim be sworn to.
 

 In the case of Altom v. Mt. Vernon Oil & Gas Co., 174 La. 775, 141 So. 457, 460, in interpreting a like provision of the lien statute (Act No. 171 of 1928), the court said:
 

 “Section 2 of the act does not require that the notice of claim shall be sworn to, consequently the registry of the claim is not intended as prima facie proof of its amount,.
 
 but only to give the lien precedence over any subsequent mortgage
 
 or lien on the property.” (Italics ours.)
 

 It is clear that the purpose of the act is to require notice of the claim to be given by setting forth the nature and amount thereof, as well as the property upon which the lien is claimed, -in order to apprise third persons of the kind of a lien which is claimed, what property is affected, and to fix the limit of the claim so that no more can be claimed.
 

 
 *952
 
 The lien filed by the intervener in the present case against Driscoll, Inc., gave notice to the public that the Supply Company had furnished materials and supplies to Driscoll, Inc., the owner of the leases in the Pyron Subdivision, amounting to the sum of $4,927.78, and that the Supply Company was claiming a privilege therefor on the leases. Simply, because the Supply Company filed a notice claiming a lien and privilege amounting to $4,927.78, securing its alleged claim, it should not be precluded from establishing its claim to a lien and privilege in a lesser amount, i. e., $3,066.01. Furthermore, the fact that the recorded notice described all of the lots in the Pyron Subdivision as being subject to the lien as a result of the mineral leases thereon and the furnishing of supplies and materials in connection with the drilling and the opera'tion of the wells, does not prevent the Supply Company from establishing its lien as affecting the leases and wells on only several of the lots in the same subdivision. If the Supply Company had, on the trial of the matter, attempted to establish a claim for more than the amount shown by the recorded notice, or on property not described therein, the court would properly hold that the Supply Company’s lien was limited to the amount stated in the recorded notice and confined to the property therein described.
 

 It is our opinion that, as J. Thos. Driscoll, Inc., owned all seven of the leases and purchased the supplies and materials continuously under one open account from the Continental Supply Company and used the same in connection with the drilling and the operation of the oil and gas wells on contiguous lots of ground, the filing of a single materialman’s lien against the seven leases and the wells drilled and operated thereunder was a sufficient compliance with -the law to permit the Supply Company, as intervener and third opponent, to show, by competent evidence, the respective amounts of materials and supplies that were used by Driscoll, Inc., as debtor and owner, in the drilling and operation of the well or wells under each of the leases, and the materialman was not obliged, under the law, to file separate liens for the respective amounts claimed against each well under each lease, in order to assert its materialman’s claim and lien.
 

 Counsel for the plaintiff next contends that as the materials and supplies were delivered by the materialman to J. Thos. Driscoll, Inc., under an open account, each order for materials and supplies was a separate transaction and the materialman’s right to record a lien therefor prescribed within sixty days from the date of delivery, under Section 2 of Act No. 145 of 1934. Learned counsel for plaintiff has not referred us to any cases in point on this issue and it is our view that the law neither provides nor contemplates such a drastic and severe requirement. If such a conclusion were justified by the provisions of the statute, it would be most impractical in its operation. An open account, in matters of this kind, is for the purpose of securing supplies and materials as they are needed and the creditor and debtor anticipate a continuous trading within reasonable limitations. In the instant case, the con
 
 *954
 
 duct of the parties showed this situation to have existed between them. The evidence shows that the recorded lien of the materialman was filed within the prescriptive period of sixty days from the date of last delivery of materials and supplies, and was therefore timely filed.
 

 The mortgage creditor next argues that its mortgage embraces six leases which were all sold in globo without separate appraisements, and that the Supply Company cannot fix a lien against the separate leases for the respective amounts of the materials and supplies, which the evidence shows went into each lease. We have already concluded that a single lien against all of the leases is valid, as they were all owned by the same party, who purchased the materials and the supplies for the drilling and operation of all of the wells under one open account. Therefore, a separate appraisement of the leases was unnecessary.
 

 Under the provisions of Article 684 of the Code of Practice, a valid sale could not be made unless the bid was sufficient to discharge the privilege existing on the property, which primed the mortgage of the plaintiff.
 

 There is no question but that under Act No. 145 of 1934 (Dart’s St. §§ 5101.1 to 5101.5) with reference to liens and privileges on oil and gas wells and mineral leases, that the privilege granted in favor of the furnisher of supplies and materials in connection with the drilling or the operation of such wells, is, under the express terms of the act, superior in rank to a mortgage on the leases. Section 2 of the statute declares “* * * such lien and privilege shall be superior to all other liens and privileges or mortgages against said property, * *
 

 In the matter of the Security Bank v. Tangipahoa Parish News, Inc., 173 La. 716, 138 So. 519, 522, this court said:
 

 “Nor was it necessary for the Security Bank to intervene in the execution proceedings under writ of fieri facias,
 
 and request a separate appraisement
 
 and sale of the property upon which it had a mortgage, as plaintiff bank could safely rely upon the mortgage certificate showing the existence, upon the property hypothecated to it, of liens and mortgages superior in rank to the claim of the judgment creditor, and as the mortgage of the bank itself also outranked the claim of the seizing creditor. Under these conditions,
 
 there could be no adjudication of the property to intervener, without the discharge by him of all of the prior liens
 
 and mortgages on the property hypothecated to the bank.
 

 “Therefore; there was no valid adjudication to intervener of the Intertype machine or of any other movable upon which he may have bid.” (Italics ours.)
 

 See, also, Morere v. Howard Odorless Cleaners, 185 La. 129, 168 So. 709, and Keller, et al. v. Summers, et al., La.App., 159 So. 198.
 

 In the instant case, the property was adjudicated for a price sufficient to discharge the existing superior or priming privilege and therefore the sale was valid.
 

 Finally, the plaintiff pleaded estoppel on the ground that the Supply Com
 
 *956
 
 pany accepted a portion of the proceeds of the loan made by the bank in satisfaction of certain oil payments “* * * being fully aware that the proceeds of such loans were being used to discharge all liens of record. * * The testimony regarding this contention shows that J. Thos. Driscoll, Inc., had assigned certain oil payments to the Continental Supply Company for materials, and supplies furnished amounting to approximately $6,000. When the plaintiff’s mortgage was executed, the Supply Company was called upon by the plaintiff’s representative to surrender these assignments for releases, upon the payment, by the plaintiff of their respective amounts from funds secured through the mortgage. It appears that the plaintiff’s representative did not make any effort to ascertain if there were accounts due other than those stated in connection with the releases of the oil assignments. The Supply Company’s representative did not do anything to mislead the plaintiff’s representative into concluding that the releases covered the entire indebtedness, or that there was not a balance due on the open account. Nothing was said or done to indicate, that the Supply Company was waiving, abandoning, or -releasing that' part of its claim or its lien therefor. It' is our opinion that the plea of estoppel is not well-founded. Central Lumber Company v. Schroeder, 164 La. 759, 114 So. 644, supra.
 

 For the reasons assigned, it is ordered, adjudged and decreed that the judgment of the district court be annulled and -set aside and -
 

 It is now ordered, adjudged and decreed, that there be judgment herein in favor of the intervener and third opponent, the Continental Supply Company, and against the plaintiff, the Mercantile National Bank at Dallas, recognizing and maintaining its materialman’s' lien and privilege on the proceeds of the sale of the leases amounting, to $20,550 in the hands of the sheriff to the extent of $3,066.01, as superior in. rank to the mortgage of the Mercantile National Bank at Dallas, and that the Continental Supply Company be paid, by preference and priority, the amount of $3,066.-01, out of the proceeds of the sale, together with legal interest from judicial demand and all costs of court.
 

 O’NIELL, C. J., dissents.
 

 LAND, J., absent.