No. 41,222

HENRY C. ADAIR, *Plaintiff*, v. TRANSCONTINENTAL OIL COMPANY, a Corporation; EMERY CONSTRUCTION COMPANY, INC., a Corporation; GEORGE B. EMERY, JR.; MOUNTAIN IRON AND SUPPLY COMPANY, a Corporation; WILLIAM J. HARRINGTON, JR.; FRANK W. LIEBERT; MIDLAND SUPPLY COMPANY, INC., *Appellees,* and DOWELL, INC., a Corporation; L. D. WHITE; J. T. McCRACKEN; M. G. JENSON; G. W. GATTON and RALPH SEARS, partners, d/b/a GATTON & SEARS DRILLING CONTRACTORS; J. W. FISHER; KEYSTONE SUPPLY COMPANY, *Appellants.*

(338 P. 2d 79)

Opinion filed April 11, 1959.

*Roy Kirby,* of Coffeyville, argued the cause and was on the brief for the appellant, L. D. White.

*Aubrey Neale,* of Coffeyville, was on the brief for the appellants, M. G. Jenson, Gatton & Sears, J. W. Fisher and J. T. McCracken.

*A. H. Harding* and *Harold Gregg,* both of Independence, were on the brief for the appellant, Dowell, Inc.

*John F. Pendleton,* of Nowata, Oklahoma, and *Dallas W. Knapp* and *Charles D. Knapp,* both of Coffeyville, were on the brief for the appellant, Keystone Supply Company.

*John F. O'Brien,* of Independence, argued the cause, and *John P. Quinlan,* also of Independence, was with him on the brief for the appellee, George B. Emery, Jr.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action to foreclose mechanics' and materialmen's liens against a block of oil and gas leases which were owned and operated as a unit.

By reason of failure to pay bills for work and materials furnished in connection with the development of these leases the action was originally filed by one of the lien claimants, a pumper, against the leasehold owners. Various other lien claimants intervened, were made parties defendant, and filed answers and cross petitions seeking to foreclose additional liens against these leases.

While numerous parties appear as appellees in the caption of this case, the only appellee asserting any interest in the appeal is the owner of the leases, George B. Emery, Jr., defendant below, whose demurrers to the amended cross petitions of the appellants were sustained by the lower court. The appellants are various lien claimants. The original petition of Henry C. Adair, plaintiff, has been dismissed with prejudice and the action at present is, in effect, a contest between Emery and various lien claimants.

The sole question is whether the facts pleaded in the amended answers and cross petitions of the various lien claimants state a cause of action against Emery for the recovery of money claimed to be due either for materials furnished or labor performed in connection with the development of leases owned by Emery, and subjecting the leases and improvements thereon to the burden of the various liens. Embraced within the foregoing is the question: Did claimants furnish labor and materials under a contract, express or implied, with the owner of the oil and gas leases, or

the agent of such owner, within the meaning of the provisions of G. S. 1949, 55-207?

The cross petitions of all lien claimants appealing are reported to be identical except for the amount claimed, and the demurrers of Emery are identical. The abstract, therefore, includes only the pleadings of one lien claimant, M. G. Jenson, and the motions and demurrer relating thereto.

A review of the involved pleadings and motions culminating in the amended answer and cross petition (as amended) here under attack is unnecessary, except to state, on the basis of the record presented for review, such pleadings are entitled to a liberal construction under familiar rules of law frequently stated. (*Walton v. Noel Co.,* 167 Kan. 274, 205 P. 2d 928; *Clark v. Meyers,* 173 Kan. 96, 244 P. 2d 217; *Hickert v. Wright,* 182 Kan. 100, 319 P. 2d 152; *Gibbs v. Mikesell,* 183 Kan. 123, 325 P. 2d 359; and *Klotz v. Board of County Commissioners,* 176 Kan. 325, 270 P. 2d 281.)

The cross petitioner's right to a lien against the block of leases in question, including improvements thereon, is based upon three separate theories, each alleged in a separate cause of action. The facts in each are similar except as to the conclusions drawn from such facts. The allegations relevant to the second cause of action, drafted upon the theory of agency, will serve to supply the factual basis for further discussion.

The second cause of action alleged that prior to July 28, 1955, Emery was the owner of ten oil and gas leases on real estate in Montgomery County, Kansas, which were operated together as a single unit by Emery. On or about July 28, 1955, Emery and Transcontinental Oil Company, a corporation, entered into a contract for the operation and sale of said leases, a copy of said contract being attached and made a part of the amended cross petition by reference. It was specifically alleged that this contract was not recorded and that the cross petitioner had no knowledge or notice of said contract at or during the time he furnished labor and materials as more specifically set forth. It further alleged:

"2. That pursuant to the terms of said contract and on August 1, 1955, the defendant, George B. Emery, Jr., placed the defendant, Transcontinental Oil Company, in possession of said leases for the purpose of improving, developing, and operating the same. That immediately thereafter, the defendant, Transcontinental Oil Company, began developing and operating and producing said oil and gas leases and incurring expenses in connection with such development, including the claim of this Cross Petitioner. That said expenses and costs of development were well known to the defendant, George

B. Emery, Jr., and that, pursuant to the terms of said contract, he was receiving benefits from the increased development and production in the form of oil runs and money payments from the defendant, Transcontinental Oil Company; that by reason of the development and operation performed by the defendant, Transcontinental Oil Company, oil and gas wells were drilled and produced on said leases, increasing the value thereof; and increasing the value of the ownership therein by the defendant, George B. Emery, Jr.; that on December 9, 1955, the defendant, George B. Emery, Jr., took possession of said leases and all of the equipment and personal property thereon including the oil and gas wells and equipment placed thereon while the same was in the possession of Transcontinental Oil Company and now holds possession of said leases with the improvements placed thereon, including the improvements made by this answering defendant and is receiving all of the oil runs from all of said leases; that by reason thereof the said defendant, Transcontinental Oil Company, was acting as the agent for the defendant, George B. Emery, Jr.; and that the defendant, George B. Emery, Jr., because of the facts alleged hereinbefore, should be estopped from denying said agency."

It further alleged that the cross petitioner under an oral contract with Transcontinental Oil Company performed labor and furnished material and oil well supplies and machinery in the digging, drilling, completing, operating and repairing of oil and gas wells for oil and gas on the described leases which gave rise to the liens asserted in the amount of $17,384.93, which amount was alleged to be due and owing the defendant, M. G. Jenson, by the defendants, Transcontinental Oil Company and George B. Emery, Jr. Further allegations disclose that the liens were properly filed within four months from the date the labor was last performed and material and oil well supplies and machinery last furnished. Foreclosure of the lien was requested.

The contract between George B. Emery, Jr. (seller), and Transcontinental Oil Company, an Illinois corporation (buyer), provided generally that Emery agreed to sell the leases and all of the oil wells and personal property and equipment used in connection with the operation of said leases for a total purchase price of $75,000, to be paid out of oil production or if production was insufficient, then the deficit was to be made up by Transcontinental Oil Company. The payments were to be made from oil runs on a monthly basis with the provision that the amount of the payment was to be increased at the rate of $250 per month for each successive month from an initial $1,000 payment to a final $5,000 monthly payment.

Specific provisions of the contract, insofar as the same are material to the issues herein presented, are as follows:

"3.

"ASSUMPTION OF OPERATIONS.

"It is understood that buyer shall take possession of said leases and the equipment thereon on August 1, 1955. *It is understood that buyer agrees to operate said leases as a prudent and skillful oil and gas operator, and shall use due care and diligence in the conduct of its operations.* It is understood that seller shall run all oil produced prior to August 1, 1955, and that all oil in the tanks after midnight, July 31, 1955, shall be considered as having been produced by buyer.

"4.

"PAYMENT OF PURCHASE PRICE.

"In connection with the payment of the purchase price, it is understood that the oil purchasing company delivers its check in payment of the oil run about the 18 day of the month following the oil purchase. *It is also understood that until full payment of the purchase price herein specified, that all payments for oil produced shall go directly to seller and shall be payable to him.*

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(d) It is understood that should the oil payment check not equal the payment to be received by seller, that seller shall notify buyer and that buyer shall have a period of fifteen (15) days after receipt of notice within which to remit any deficit between the amount due seller for said monthly payment, and the amount of the oil payment received from the purchasing company. In this connection it is definitely and distinctly understood and agreed that time is of the utmost essence in making payment of any deficiency herein contemplated, and that if any such deficit payment is not received exactly within the time herein specified, then seller shall have the full and complete right to declare a forfeiture as specified in paragraph 9 hereof.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"7.

"RIGHTS ACQUIRED BY BUYER PRIOR TO PAYMENT; LIMITATIONS.

"*Until the full payment of the purchase price* herein provided for, it is understood that *buyer obtains no right, title or interest in said property other than the right to purchase said property* upon the terms and conditions and for the price specified, *together with the right to develop and operate said property to the end that production from said property may be increased to make the payment therefor.* It is further distinctly understood that:

"(a) *Buyer does not have such an interest in said property as will permit the attachment of liens for the purchase of equipment or for operation expense.* In this connection it is understood that buyer promises and agrees to keep said property free and clear of all debt or operations or development or other expense.

"(b) It is understood that buyer does not have such an interest in said property as will permit the assignment of any interest in any leasehold estate or the assignment of any right under this contract of record, without the express prior approval of seller.

"(c) It is understood that seller shall not be responsible in any way for any liability incurred by buyer in the operations. Buyer agrees to indemnify

and save harmless the seller from any and all damages to life or property that may result from its operations.

"(d) It is understood that buyer so long as it shall operate said property is an independent operator and that buyer cannot be considered in any way an agent, servant, or employee of seller, and that seller shall in no respect be responsible for any of buyer's operations.

"8.
"INSURANCE AND PAYMENT OF TAXES.

"It is understood that *seller shall carry adequate public liability, and workmens compensation insurance, the amount of which shall be subject to seller's approval.* It is also understood that *buyer shall carry property damage insurance to be approved by seller,* and that any loss compensated for by such insurance shall be payable as the interests of the parties appear. It is understood that buyer shall promptly pay all taxes that may be assessed against the property.

"9.
"FORFEITURE OF BUYER'S RIGHTS.

"It is understood that *in the event buyer shall 'default* in payment of any monthly payments as herein provided, or shall fail to keep the property insured, or taxes paid, *or shall permit the attachment or any lien or judgment against said property,* that seller may at his option declare an immediate forfeiture of buyer's rights herein and may demand and shall be entitled to immediate possession of said purchase price not paid at the time of such default shall be immediately due and payable and seller shall have the right to make immediate demand upon said buyer for the entire balance then remaining unpaid of said purchase price. In such event if buyer shall not within thirty (30) days after such demand, pay the entire balance of said purchase price, then seller shall have the right to receive from said escrow holder, the assignment held by it and to recover possession and operations of said leases, and may bring an action in any court of competent jurisdiction to recover the entire balance of said purchase price. In such event it is understood that all payments which may have been received by seller shall be and are the agreed upon rental value of the property and the loss and detriment which shall be suffered by seller by reason of buyer not having complied with this agreement.

"10.
"MISCELLANEOUS PROVISIONS.

"(a) *It is understood that all additions to said property, including all wells drilled and equipment installed upon said leases, shall be considered as part of the leasehold estate* and in the event of default by buyer, shall remain a part of said property.

"(b) *It is understood that buyer shall not have the right to pull, plug, or abandon any well without the consent of seller.*

"(c) *It is understood that buyer shall not have the right to sell any equipment from said property without the consent of seller.*

"(f) Seller reserves the right to personally, or through his duly authorized

representative, inspect said leases or the operations at any time." (Emphasis added.)

It was not until forced by an order of the trial court, upon motion to produce the written contract, that cross petitioner had any information concerning the terms of such contract, whereupon the amended cross petition was amended and redrafted to allege the contract.

Cross petitioner makes no allegations concerning dealings directly with Emery at any time, and this appeal presents no question concerning the liability of Transcontinental Oil Company to the several lien claimants for the sums claimed.

The first cause of action alleged cross petitioner's dealings were with Transcontinental and stated that the relationship between Transcontinental and Emery, by reason of the terms of the written contract above set forth, was one of *joint adventure.*

The third cause of action alleged cross petitioner's dealings with Transcontinental as owner of the leases and stated that Emery claims some interest in the leases inferior and secondary to his lien and against which he seeks to quiet his title.

The appellee, Emery, states in his brief:

". . . In our judgment the most important issue for decision of the court is the content of this contract. Appellant has consistently throughout his brief adopted the attitude that the contract specifically required Transcontinental to *develop* the leases. There is no requirement in the contract that Transcontinental was required to do any *development* of any kind . . ."

The position taken by the appellee is that appellant did not allege a contract, express or implied, with Emery, the owner of the leases, or with an agent of Emery, and therefore no lien for labor and materials furnished can attach to his interest. The Kansas law upon which appellee relies is confined exclusively to cases under the mechanic's lien statute applicable to real estate. (G. S. 1949, 60-1401; *Spalding Lumber Co. v. Slusher,* 121 Kan. 155, 246 Pac. 999; *Kennedy v. Atchison,* 162 Kan. 694, 178 P. 2d 987; *Norris v. Nitsch,* 183 Kan. 86, 325 P. 2d 326; and many earlier cases.) He contends the oil and gas lien statute (G. S. 1949, 55-207) is analogous and decisions concerning the mechanic's lien statute are controlling. (Citing *Meadows v. Oil Co.,* 108 Kan. 228, 194 Pac. 916; and *Mendenhall v. Producing Co.,* 115 Kan. 729, 224 Pac. 925.)

Appellant on the other hand contends the law and decisions relative to oil and gas leases are different from the law applicable

to liens on real estate. (Citing *Meadows v. Oil Co.*, supra; *Skinner v. Oil Co.*, 112 Kan. 742, 212 Pac. 684; *Mendenhall v. Producing Co.*, supra; *Woodmansee v. Oil and Gas Co.*, 113 Kan. 637, 216 Pac. 276; *Jones v. Sunflower Natural Gas Corp.*, 137 Kan. 790, 22 P. 2d 482; and *Meyer v. Latta*, 178 Kan. 316, 285 P. 2d 782.) He contends that labor and materials actually furnished and used on oil and gas leases entitle the laborers and materialmen to liens, whether the labor and material were furnished directly to the owner or to a third person in charge of the leases either under a contract of purchase or any other operating agreement, as agent, trustee or owner.

The mechanic's lien statute (G. S. 1949, 60-1401), relative to real property, provides in part:

"Any person who shall under a *contract* with the owner of any tract, or piece of land, or with a trustee, agent, husband or wife of such owner, . . . perform labor or furnish material for the erection, alteration, moving or repair of any building, improvement or structure thereon, . . . shall have a lien upon the whole of said piece or tract of land, the building and appurtenances, . . ." (Emphasis added.)

The oil and gas lien statute (G. S. 1949, 55-207), relative to leasehold property, provides in part:

"Any person, corporation or copartnership who shall under *contract, express or implied*, with the owner of any leasehold for oil and gas purposes, . . . or with the trustee or agent of such owner, who shall perform labor or furnish material, machinery and oil-well supplies used in the [development or operation of the leasehold] . . . shall have a lien upon the whole of such leasehold, . . . or lease for oil and gas purposes, the building and appurtenances, and upon the material and supplies so furnished, . . ." (Emphasis added.)

For purposes of this case the difference in the two statutes relates only to the term *contract*. In one the word *contract* is used and in the other the term *contract, express or implied*, is used. In either case the *contract* or *implied contract* must be with the *owner*, his *agent*, or *trustee*. The oil and gas lien statute does not authorize a lien upon the real property but is analogous to the regular mechanic's lien statute and decisions concerning such liens are controlling insofar as they are applicable. (*Mendenhall v. Producing Co.*, supra, and authorities cited therein.)

The inherent difference between real property and an oil and gas lease, which is personal property, gives rise to situations under the oil and gas lien statute in the operation and development of oil and gas leases which do not confront the court under the mechanic's lien statute.

·It would serve no purpose to dwell at length upon our cases cited by the respective parties in an effort to distinguish the factual situations presented from those in the case at bar. It must be recognized that the point of law presented by the pleadings of the appellant gives rise to a case of first impression in this jurisdiction.

We have no hesitance in summarily stating appellant has alleged no act or course of conduct on the part of appellee upon which to sustain a finding that the relationship of joint adventures existed between appellee and Transcontinental. Nor could the allegations sustain a finding that Transcontinental was the owner of the leases in question. (*Callender v. Crossfield Oil Syndicate*, 84 Mont. 263, 271, 275 Pac. 273.) Therefore, the trial court properly sustained appellee's demurrers to the first and third causes of action.

Do the pleadings under attack allege sufficient facts to make Transcontinental the agent of Emery, subjecting Emery's leases to the burden of appellant's lien?

Clearly, under 55-207, *supra*, Transcontinental must be shown to be the agent of Emery to create the lien involved. While the conditional sales contract should, if such relationship exists, sufficiently disclose Emery's fingerprints, it is not upon this instrument alone but to all of the facts alleged in connection with this transaction that we must look to determine whether a connection in the nature of an agency exists between Emery and Transcontinental and as a consequence the right of the appellant to a lien.

The allegations of appellant to which we must look to determine agency, briefly stated, are:

(1) That Emery entered into an agreement with Transcontinental; (2) the terms of the agreement; (3) that Transcontinental went into possession under the terms of the agreement; (4) that Emery knew Transcontinental was operating and developing the leases pursuant to the terms of the contract; (5) that Emery received the proceeds of all oil runs from the leases, including the benefits from increased development and production by Transcontinental; and (6) that Emery, prior to the filing of appellant's lien, took possession of the leases including all improvements placed thereon while such leases were in the possession of Transcontinental.

Liberally construed, the appellant's pleadings disclose that the oil and gas leases in question were producing oil at the time possession was transferred to Transcontinental on August 1, 1955, and that these leases, being operated as a unit, were not fully

developed. Emery and Transcontinental at the time they entered into the agreement were presumed to know the law concerning the duty of a lessee under the implied covenant to develop an oil and gas lease. (See *Temple v. Continental Oil Co.,* 182 Kan. 213, 320 P. 2d 1039 [rehearing denied, 183 Kan. 471, 328 P. 2d 358], and cases cited therein.) The language in paragraph 3 of the contract, worded in phraseology frequently used by this court to define a lessee's obligation under the implied covenant to develop an oil and gas lease, was no doubt intended to impose upon Transcontinental Emery's obligation to further develop the leases. By the contract Transcontinental acquired *no right, title or interest* in the leases, except the right to develop and operate the leases (made an obligation by paragraph 3) so that production might be increased to make the payments to Emery required by the contract.

By the contract Transcontinental acquired *no interest* to which liens could attach for the purchase of equipment or the performance of labor in the operation of the leases (paragraph 7a), but inferentially the contract recognized Transcontinental's power to obligate Emery's interest in the leases to the burden of a lien once Transcontinental was placed in possession of the leases under the contract (paragraph 9). Under these circumstances Emery cannot be heard to say that only the interest of Transcontinental was subject to the lien of appellant (citing *Norris v. Nitsch,* supra) for Transcontinental was given no interest to which liens could attach.

Emery's commitment under the contract to carry adequate public liability and workmen's compensation insurance cannot be overlooked (paragraph 8.)

Thus, we have a situation in which the contract was entered into for the primary benefit of Emery, the owner of the leases. Under the terms of the contract, the conditional vendee, Transcontinental, was authorized and permitted to enter into possession of the premises, then required to operate and develop the leases for the benefit of Emery. All additions or improvements to the leases in the course of development became the property of Emery (paragraph 10). The contract directed the disposition of the proceeds. The entire amount raised from oil runs, including the increase from further development, was to be paid directly to Emery by the oil purchasing company (other than Transcontinental) on the purchase price of the leases, while Transcontinental

was in possession operating and developing the leases. Emery in a measure, controlled operations under the terms of the contract. He was, in fact, the real party for whom the work was done and for whose benefit the leases were operated and developed. The indebtedness was incurred to the end that the leases might be made productive for his benefit.

It is true that as a general rule the conditional vendee of a leasehold estate will not be considered the agent of the owner thereof to permit the creation of liens against the leasehold, but, upon sound reason and good authority in other jurisdictions, a clear exception to that doctrine exists in cases where the lien indebtedness is created while the conditional vendee of the lease is operating it, not for his own, but for the owner's benefit. In such case the law looks upon the operator of the lease as the agent of the owner, for lien purposes, upon the theory that the owner will not be allowed to reap the benefits of the operation without at the same time subjecting the lease to the satisfaction of payment for that which produced the benefits.

This is an agency by operation of law, a theory based upon fiction to be sure. (See *Witmer v. Estate of Brosius*, 184 Kan. 273, 336, P. 2d 455, for a recent case where, through fiction, restitution was forced on the theory of quasi-contract or constructive trust on the ground that a decedent's estate was unjustly enriched.) Why should an owner of a leasehold be unjustly enriched at the expense of those who perform labor and furnish material?

It is recognized in this jurisdiction that the lien of one who performs labor and furnishes material for the operation and development of an oil and gas lease is a creature of statute and in derogation of the common law. The basis upon which this class of legislation rests is well stated by Justice Brandeis in *Piedmont Coal Co. v. Seaboard Fisheries Co.*, 254 U. S. 1, 41 S. Ct. 1, 65 L. Ed. 97:

". . . The principle upon which the mechanic's lien rests is, in a sense, that of unjust enrichment. Ordinarily, it is the equity arising from assumed enhancement in value resulting from work or materials expended upon the property without payment therefor which is laid hold of to protect workmen and others who, it is assumed, are especially deserving, would ordinarily fail to provide by agreement for their own protection and would often be unable to do so." (pp. 9, 10.)

This court has used similar language in *Given v. Campbell*, 127 Kan. 378, 273 Pac. 442:

"The general theory underlying lien statutes is that labor, material and supplies which are devoted to the construction of an improvement to realty, whether building, oil-and-gas well, or whatnot, add an actual value to the property, and in consequence the property may justly be bound as security to pay for contributions enhancing its value. . . ." (p. 380.)

In *Bridgeport Machine Co. v. McKnab*, 136 Kan. 781, 18 P. 2d 186, the rule of construction pertaining to lien statutes has been stated as follows:

"Oil and gas lien laws like other lien laws of this state are purely statutory and as they confer special privileges they should be strictly construed, so that in determining to whom and for what a lien statute gives a lien, a strict construction should generally apply, but after interpreting it to entitle a party to a lien for a particular article or thing, then a liberal interpretation should generally be given as to its enforcement so as to promote the object to be effected." (Syl. ¶ 1.)

Application of the foregoing rule of construction would seem, on the surface, to require a strict construction of the statute as to *whom* in the instant case G. S. 1949, 55-207, gives a lien. The Supreme Court of Oklahoma in *Thacher v. International Supply Co.*, 176 Okla. 14, 54 P. 2d 376, confronted with this situation upon facts similar to those in the case at bar, said:

". . . On first impression it appears that where, as in the instant case, the contract between the owner and the operator, and the practice thereunder, create what would ordinarily be termed the relationship of independent contractor and contractee, it would be paradoxical to subject the lease to lien claims on the theory that the operator was his agent. But it is not paradoxical when one remembers that he may not escape or evade his statutory liability by the simple expedient of resorting to the doctrine of independent contractor. In other words, in a proper case it is an agency by operation of law. The parties are presumed to contract with reference to the lien law. . . ." (p. 17.)

In *State ex rel. v. Continental Supply Co.*, 137 Okla. 24, 278 Pac. 269, the Oklahoma court had a case for all practical purposes identical with the case at bar. There a conditional vendee of a leasehold estate, created by an oil and gas lease, was given the right to enter upon the premises for the purpose of cleaning out any of the wells thereon and operating the leasehold, and was given the right to drill any of the wells deeper or to drill any other wells upon the leasehold with the understanding that all of said operations were to be at the vendee's own expense and "that he will not create or allow any lien to be filed or to accrue against the said property by reason of his operations, and that he will pay for all

such operations promptly when due." The parties further agreed "that the oil runs from said property up to the time of the delivery of said deed and assignment shall be paid direct to the [vendor] . . . and shall be applied as payment on the notes of the [vendee], . . . after the deduction of the pumper's salary of $75 per month, and the other incidental and ordinary expenses, not to exceed a total expenditure" of $100 including the salary of the pumper. At the time the conditional sales contract was entered into between the parties there were two small producing oil wells on the premises. Upon operation of the premises by the conditional vendee he purchased materials and became indebted for labor and materials for which liens were filed against the owner of the leasehold. It was stipulated the claimant had no agreement or contract direct with the vendor for the purchase of material or hire of labor for the development of the lease, but such contracts and agreements were with the conditional vendee. By reason of failure to comply with the contract of sale the owner of the leasehold declared a forfeiture. The court held the contracts were entered into for the primary benefit of the owner of the leasehold estate, and said:

"The contracts made by Bunte [the conditonal vendee] for the development of this lease must, therefore, in law, be considered and held to be contracts of [the owner of the leasehold-vendor], . . . and subject to the liens. Parties cannot be permitted to evade the lien statute by merely making conditional sales contracts with insolvent vendees." (p. 26.)

Again, in *National Oil & Development Co. v. Bible et al.*, 177 Okla. 24, 57 P. 2d 632, the Oklahoma court on facts almost identical to the *Continental Supply Co.* case previously before it followed the rule above announced. In the *Bible* case the contract is almost identical in material respects to the case before us. The National Oil & Development Company owned two oil and gas leases. It entered into a conditional sales contract with F. W. Freeborn, whereunder it agreed to convey the leases to him, the purchase price of $3,000 to be paid from the entirety of the first oil runs from the wells on the leases. The agreement further provided that should the net amount paid to the company during any month from the oil runs be less than a certain amount named in the contract, the buyer, Freeborn, should make up the difference in cash. It was also provided in the agreement that the National Oil & Development Company, seller, should be entitled to the surplus gas from the use of the leases until the payment of the

purchase price; that the buyer, Freeborn, should have the operation of the leases, and that he should not incumber the leases nor create any liens thereon; that in case of default in the payment of any monthly installment on the purchase price the seller, National Oil & Development Company, should be entitled to retake possession and operation of the leases; that title should remain in the seller until completion of the payment of the purchase price; and that proper assignments of the leases would be delivered to the buyer, Freeborn, upon completion of the payment of the purchase price. The agreement was recorded.

The conditional vendee took possession, operated the leases, and contracted for certain labor which resulted in lien claims against the leasehold estate. The contention advanced was that a materialman's or laborer's lien must arise from a contract between the lien claimant and the owner or his agent, that the conditional vendee was neither the owner nor the agent of the owner of the leases, and that therefore the lien claimants were not entitled to enforce their liens. The court held the operator of the lease, the conditional vendee, to be the agent of the owner of the leasehold estate on the theory of agency by operation of law following its prior decisions. In the opinion the court said:

". . . Under the contract in the instant case the plaintiff in error not only derived the entire income from the operation of the leases during the pendency of the contract, but upon default therein by the conditional vendee, Freeborn, the plaintiff in error became owner of such additional machinery and improvements as the vendee had placed upon the leases. Thus it appears that the plaintiff in error has received the entire benefits caused by the labor of the claimants, resulting in their liens." (p. 25.)

The Supreme Courts of Montana and Louisiana have held contrary to the Oklahoma court on facts which appear to present the point of law in question. (*Callender v. Crossfield Oil Syndicate*, 84 Mont. 263, 275 Pac. 273; and *J. S. Abercrombie Co. v. Lehulu Oil Co.*, 181 La. 644, 160 So. 126.) We cannot subscribe to the reasoning of these opinions on the facts presently before us.

Other courts in analogous situations have come to the same result as the Oklahoma court although not clearly termed an agency by operation of law.

The Indiana Supreme Court in *Pierce v. Blair*, 196 Ind. 710, 149 N. E. 560, under a contract by which purchasers of a coal mine were to keep it in operation and pay the owners one-half of the gross proceeds, and entitled to salaries only until the agreed price was

fully paid, held that the miners had the same rights to liens for wages under statute against the owners as if employed directly by them. The court said:

"As applied to the operation of a mine under a contract with the owners by which the 'purchasers' were to keep the mine in operation, and pay the owners one-half the gross proceeds from sales of coal taken out, after deducting the estimated cost of digging and selling, which payments were not to be less than $30,000 per year in any event, and by which the purchasers were also to pay interest on the purchase money and keep up the mine, and could receive only salaries until the agreed price should be fully paid, subject to the forfeiture of all that might be paid toward the purchase price and of all title to the mine in case of any default for twenty days in paying principal or interest, or performing conditions, *we think the miners must be held to have been employed by authority and direction of the owners, and to have the same rights to a lien against the holders of the mortgage as if employed directly by the owners themselves.* . . . Where the owner of a mine, instead of reserving a mere royalty, has, by contract with the operator of his mine, bound the latter for a period of years to pay directly to him a large part of the gross receipts from sales of the coal taken out, and to pay for his benefit practically all the remainder in excess of an estimated cost of digging the coal, which includes a monthly salary for such operator, *he will not be heard to deny that the mining was done on his behalf to the degree that whatever title he may have to the mine will be subject to a statutory lien for wages earned in taking out the coal.* . . ." (Emphasis added.) (pp. 716, 717, 718.)

The Missouri Supreme Court had a mechanic's lien law before it in *Allen Estate Association v. Boeke,* 300 Mo. 575, 254 S. W. 858. There the tenant of a 99-year lease was bound by an agreement to make permanent and substantial improvements to the leased premises beneficial to the reversionary interest of the owner. The contract expressly provided that no provision in the lease, whether those requiring and permitting the lessee to make repairs, alterations or improvements or to erect new buildings upon the premises, or any other provision, shall be construed to constitute the lessee the agent of or authorized to act on behalf of the lessor in any respect for the doing of anything whatever. It further provided that all persons doing work or furnishing materials to or for any improvements on the leased premises by the lessee shall look only to the lessee and its interest and shall not be entitled to look to the lessor or its interest in the premises. After improvements were made the lessee defaulted, and the lessor forfeited the lease and took possession. Lien claimants had not been paid. The court held: Though a lessee as such was not an agent of the owner under the statute giving mechanic's liens on buildings for work

and material furnished under a contract with the owner or his agent, a lessor, by requiring his lessee to make improvements of substantial benefit to the reversion, made the lessee his agent, and those furnishing labor or material under contracts with the lessee had a right to mechanic's liens against the lessor's reversionary interest, even where the lease expressly provided that the lessee was not the agent to bind the lessor, and that the contractors should look solely to the lessee's interest in the premises.

The language in several Kansas cases on the surface appears to be directly in point and controlling of the decision herein. In fairness these cases should be mentioned to avoid any misapprehension concerning the application and effect of this decision. They are *White v. Kincade*, 95 Kan. 466, 148 Pac. 607; *Meadows v. Oil Co.*, 108 Kan. 228, 194 Pac. 916; and *Mendenhall v. Producing Co.*, 115 Kan. 729, 224 Pac. 925.

In *White v. Kincade*, supra, it was said concerning a mechanic's lien:

". . . A vendor of land who induces one who has contracted to purchase it to expend labor and material in improving the land can not defeat the claims for a lien of those who contribute their labor and material to enhance the value of his property . . ." (p. 469.)

The foregoing language was quoted in the *Mendenhall* case which approved a memorandum decision written by the trial court therein. On the facts before the court in those cases the statement was correct but the factual situation presented in the instant case is quite different. Here the express contract between the conditional vendee and the vendor, who owned the leases, provided that the conditional vendee should operate said property as an independent operator and that he could not be considered in any way an agent, servant or employee of the vendor, and that the vendor should in no respect be responsible for any of the vendee's operations. As between the vendor and the vendee this contract, therefore, controlled not only their relationship to each other but also their rights and liabilities to each other in accordance with its express terms. Resort to this express provision in the contract relative to agency precludes any determination that the conditional vendee was the agent of the vendor on the theory of an implied agency. (See *Kennedy v. Atchison*, 162 Kan. 694, 178 P. 2d 987; and 2 C. J. S., Agency, § 23.) It likewise precludes any consideration of liability on the part of the vendor to lien claimants on the ground of implied contract since a contract implied in fact is one not expressed by the

parties, but implied from facts and circumstances showing a mutual intention to contract. It does not arise contrary to law or the *express* declaration of the parties. (17 C. J. S., Contracts, § 4b, p. 318; *In re Estate of Langdon,* 165 Kan. 267, 195 P. 2d 317; *Huffman v. Wilkes,* 140 Kan. 637, 37 P. 2d 988; and *Scherger v. Union National Bank,* 138 Kan. 239, 246, 25 P. 2d 588.)

It would likewise be improper to regard the conditional vendee on the allegations presently before the court as the apparent or ostensible agent of the vendor giving rise to an agency by estoppel. There is no allegation anywhere in the answer and amended cross petition of the appellant that he knew and relied on conduct of the principal (Emery) which led the appellant to believe that he was dealing with the conditional vendee as an agent. (See 2 C. J. S., Agency, § 23g, p. 1050.) To the contrary, the allegations disclose that the lien claimant (appellant) was dealing directly with the conditional vendee (Transcontinental) without any indication that he had knowledge of the vendor's (Emery's) existence.

At this point it should be noted appellee states this court has never attached any significance to the recording of a conditional sales contract with reference to the attachment of liens. We shall assume this statement to be correct concerning the oil and gas lien statute for purposes of this opinion, since neither party has briefed the point. This assumption, however, should not be construed as a holding by the court. (See *Mendenhall v. Producing Co.,* supra.)

In the *Meadows* case the court said:

". . . Under the general finding, the court must have found the existence of some one of the conditions named in the statute under which a lien could be claimed and filed; either that the Buffalo Company was the owner of the lease, the agent of the owner, or a contractor with the owner. The evidence compelled a finding that one of these situations existed. . . . If when the property was turned over to the Buffalo Company, the Bolin Company retained an interest in the property or any right thereafter to occupy or retake it, development made by the Buffalo Company would be made in one of the several capacities described, and the liens would attach. . . ." (p. 231.)

The factual situation there presented, not appearing in the opinion, has been checked against the original abstract on file, but it does not disclose the pleadings of the parties or the contract which was not introduced in evidence. On the basis of the testimony the factual situation was quite different than the facts presently before the court. For this reason the *Meadows* case is not regarded as a controlling precedent herein, although the extent to which this

court has heretofore liberalized the oil and gas lien statute is indicated in *Meadows v. Oil Co.,* supra, and *Woodmansee v. Oil and Gas Co.,* supra. (See *Rodgers v. Arapahoe Pipe Line Co.,* 181 Kan. 579, 313 P. 2d 740.)

In all cases upon which appellee relies, contending the agency theory cannot be sustained (*Kennedy v. Atchison,* 162 Kan. 694, 178 P. 2d 987; *Norris v. Nitsch,* 183 Kan. 86, 325 P. 2d 326; and other cases cited in these opinions), the tenants in possession were permitted to make improvements for their sole use and benefit. In the instant case the vendor was in fact the real party for whom the work was done and for whose benefit the leases were operated and developed.

Appellee does not challenge appellant's contention that where a number of leases are operated as a single unit and materials are supplied or labor performed under a single contract for the development of the leases, a single lien statement timely filed creates a valid and enforceable lien upon all of such leases which may be sold to satisfy the lien. With respect to mechanic's liens the so-called "blanket lien" theory has been firmly adopted. (*Golden Belt Lbr. Co. v. McLean,* 138 Kan. 351, 26 P. 2d 274, and cases cited therein.) We see no reason why, upon all the facts and circumstances presented by the allegations in the record before the court, the same rule is not applicable to the oil and gas leases operated as a single unit in the instant case under the oil and gas lien statute. The Louisiana court in *Mercantile Nat. Bank v. J. Thos. Driscoll, Inc.,* 194 La. 935, 195 So. 497, decided in 1940, held that where one company owned all seven oil leases and wells in connection therewith, and supplies and materials for all properties were purchased under one open account and used in drilling and operating oil and gas wells on contiguous lots, the filing of one lien against the seven leases and wells sufficiently complied with the law and separate liens claimed against each well under the lease were not necessary.

We therefore hold appellant has properly alleged a cause of action on the theory of agency subjecting the leases of Emery to the burden of appellant's lien. Irrespective of any language used in the contract between Emery and Trancontinental, binding as between them, the operation and development of the leases as a unit pursuant to the conditional contract of sale by Transcontinental for the benefit of Emery made Transcontinental for lien purposes the agent of Emery by operation of law. The parties

are presumed to have contracted with reference to the oil and gas lien statute.

The oil industry is fraught with brilliant and ingenious minds, some of which, lured to the industry by the element of chance and potentially fabulous profits, are bent upon sharp practices. The law must be ever vigilant to prevent fraud. If permitted to evade the lien statute by an independent conditional sales contract as set forth in the instant case, it would be possible for an unscrupulous oil and gas operator possessed of leases with questionable productive capacity to defeat just claims of the unwary who perform labor and supply materials in development of such oil and gas leases. It would be relatively simple to organize an expendable, controlled corporation with limited assets with which to make an independent contract for the development of the leases and conveniently defeat the liens in the event of failure, or to contract with an insolvent and accomplish the same result.

It must be recognized that this is an exception to the general rule under Kansas law calling for strict construction of a lien statute in determining to whom and for what a lien statute gives a lien. Be that as it may, and notwithstanding authorities in some jurisdictions to the contrary, we find ourselves in good company when we hold squarely, as we feel compelled to do, that in the instant case Transcontinental was the agent of Emery by operation of law. A contrary holding would readily supply, in the form of an independent contract, an instrument to circumvent the oil and gas lien statute.

The judgment of the trial court sustaining the demurrer of Emery to the first and third causes of action set forth in the appellant's cross petition is affirmed, and as to the second cause of action is reversed with directions to proceed in accordance with the views expressed herein.

ROBB, J., concurs in the result.