No. 37,060

In re Estate of Mildred E. Langdon (otherwise known as Mildred Heise Langdon) deceased. HARRY CLIFFORD LANGDON (revived in the name of Hugh C. Langdon, Administrator of the Estate of Harry Clifford Langdon, deceased), *Appellee,* v. JOHN P. FRITTON, Executor of the Last Will and Testament of Mildred E. Langdon, and WILLIAM M. MILLS, JR., Guardian *ad litem* for Rose Heise Walters, *Appellants.*

(195 P. 2d 317)

Opinion filed June 12, 1948.

*Randall C. Harvey* and *William M. Mills, Jr.,* both of Topeka, argued the cause and were on the briefs for the appellants.

*Tinkham Veale,* of Topeka, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This case involves a claim by Harry Clifford Langdon against the estate of his deceased wife, Mildred E. Langdon. The claim was disallowed in the probate court and allowed on appeal by the district court. The executor of the Mildred E. Langdon estate

and the guardian *ad litem* for Rose Heise Walters, an insane legatee, have appealed from the judgment of the district court.

After the action was tried the claimant died and the action was revived in the name of Hugh C. Langdon, administrator of the estate of the claimant.

The will of Mrs. Langdon was probated. The signature of Mr. Langdon, which it is admitted he did not attach, was pasted on the bottom of the will by his wife. The husband elected to take under the law of intestate succession. No children were born to this union. The wife had no children. Her husband had one son by a prior marriage. The husband's right in the homestead and a widower's allowance were set aside to him by the probate court. It is conceded the husband is entitled to one-half of the net value of his wife's estate.

The claim of appellee was: In addition to his right to a one-half interest in his wife's estate he had a one-half interest of his own in certain stocks and bonds, the subject of this litigation, which were purchased by his wife with joint funds; the securities were taken in her name and were all bequeathed to her brothers and sisters; Mr. and Mrs. Langdon had an understanding and agreement that he would, and did, regularly during their entire married life from 1919 to 1945 deliver his semimonthly pay checks to her to be deposited in their account in a designated bank and that she was to invest in securities whatever amount remained after paying their monthly living expenses; she was a good business woman and was entrusted to handle all investments; she purchased the securities in her own name without so advising appellee; the stocks and bonds were discovered in her locked trunk after her death; his wife held his interest in the securities in trust for him and he was entitled to at least one-half of their value in his own right.

His claim was for the sum of $3,743.31.

The testimony of appellee, to which there was no objection, in substance, was: He was sixty-five years of age; Mrs. Langdon was ten or twelve years younger; they were married in 1919; he had been employed continuously by the Atchison, Topeka & Santa Fe Railway Company for thirty-three years; he was the tower man at Second street in Topeka and worked seven days a week; his average monthly earnings were $128.78; at the time of his wife's death he was making about $183 per month; he and his wife never had any serious difficulty; when they were married he had about $700 and

she received $752 from her father's estate; the money they had was invested in a home; the home they occupied last was valued at $6,700; he played in his own orchestra from 1923 to 1938; his average annual earnings from the orchestra were about $700 (the amounts earned annually in that manner as shown by his book account, however, ranged between $117.50 and $319.50); he kept a record of his earnings from the Santa Fe in little notebooks; the books also contained correct notations respecting the disposition he had made of his salary checks; he and his wife were exceedingly frugal; she worked about half the time for fifteen years and made approximately $17 to $20 per week, she rented a few rooms for a short time during the early part of their marriage; she kept her money and invested it in securities; they had a car; having a pass on the Santa Fe they took a short vacation every year; their actual living expenses were very small and did not exceed $55 per month; he had his own bank account at first, but in 1928 it was made a joint account; his wife was a very good business woman and handled all their business affairs; after 1928 he drew on the bank account only once and that was to pay some taxes; his wife's niece, Cecilia Fritton Whittenburg, lived with them about a year in 1939; she was like a member of their own family; Mr. and Mrs. John P. Fritton also lived with them about seven or eight months; the night before the funeral he looked for his insurance papers and could not find them; he called the home of Mr. and Mrs. John P. Fritton and was advised to come over and that they had his wife's box; he had never had a key to the box and did not know where it was; Mrs. Fritton showed him the box and asked him why he didn't unlock it, saying she did not have the key; he told her he did not have the key and had never had or seen it; he noticed some instrument apparently had been used to pry open the box; he was working with the box and it "popped open"; his insurance papers and Mrs. Langdon's will were in the box; there were no securities in it; he saw his name had been pasted on the will; at the time of his wife's death there was only $67 in their bank account.

Testimony on behalf of appellee also disclosed: Cecilia Mildred Whittenburg is a niece of Mrs. Langdon and a daughter of Mr. and Mrs. John P. Fritton. John P. Fritton is the executor of the Mildred Langdon estate.

Mrs. Whittenburg's deposition was introduced as a part of appellee's case in chief. Her testimony, in substance, was: Mr.

Langdon was ill in 1939 and Mrs. Langdon asked her to come and stay with them; she lived with them approximately six months; she was on good terms with both Mr. and Mrs. Langdon and had no interest in the lawsuit; Mr. Langdon was a very generous type of person; the Langdons were both exceedingly frugal, cautious about turning off lights, using too much water, changing their clothes to save cleaning bills and things of that character; Mr. Langdon received his check from the Santa Fe twice monthly; she saw him turn his check over to Mrs. Langdon on four or five occasions; she heard Mr. Langdon tell her to put the money into the checking account, the savings account, the Christmas account, building and loan or whatever investments they were making; Mr. Langdon was very fond of government bonds and she heard him tell Mrs. Langdon to put money aside for them because they were not taxable; Mrs. Langdon ordinarily said little in response to such statements but nodded and said, "I know where to invest it"; Mrs. Langdon told her how she and her husband conducted their business affairs.

A part of Mrs. Whittenburg's testimony was:

"One day my aunt told me she wanted to give me some advice, that she wanted to give me some experiences from her own personal married life, she' and Mr. Langdon, and she told me she wished to give me some advice that she had gained from her own personal life, wanted to tell me of her activities *and what she had done during her own marriage* that would be helpful to me. She said 'Always get you husband's salary or pay check turned over to you,' and she said 'Be sure he doesn't cash his check, that you get it and cash it yourself, then you will know how much he is making.' Then she said 'That way you will know, if you have the money *and put everything in your own name,*' she said, 'you will know where the money goes, you will know what is done with it,' and she said she had some Kansas Power and Light Company stock and some Cities Service stock and some telephone stock, and *she said she had bought that stock with money from her husband's pay check, his salary from the Santa Fe and from the orchestra.* She said if she hadn't done that, hadn't gotten everything in her own name, that Mr. Langdon was very soft hearted and his relatives had had lots of illness and family trouble and he would have given all of their money, or at least part of it, to them, that he was quite generous." (Our emphasis.)

Mrs. Whittenburg further testified:

"She [Mrs. Langdon] was very bitter about the fact that my uncle had loaned his sister $15.00 and she had never gotten it back and she said 'That sort of thing can't happen if you have the money in your own name. He can't get it out.' She said 'If ever you get any money be sure and buy these stocks,' and she mentioned to me the Kansas Power and Light stock and Cities Service and the telephone stock. That is all she had at the time, or

all she told me she had. Then she showed me one of his pay checks and said it was quite small that month because he felt he had to take a few Sundays off. My uncle always worked seven days a week, and she was quite bitter because he wanted a few Sundays vacation. *She said it used to be larger but she said she had purchased these stocks with money taken from my uncle's salary or that he gave to her and she said 'Never let him know what you do with it. He doesn't know that we have this stock.'*" (Our emphasis.)

The witness further testified:

"She [Mrs. Langdon] said 'I never let him see the mail' and I knew that was true because many times I had rushed home with her in the car from town and picked up all the mail, and if he had any letters she used to steam open the envelopes and if she felt he shouldn't see it she would destroy the letters. He never got to see her correspondence at all. Another time she showed me *some dividends from the telephone stock* and said it was perhaps only $2.00 that time and maybe $12.00 the next time, but she said 'I can go down and buy myself a hat or a pair of hose, and I have sent money to Uncle Bill (her brother who is a beneficiary in this will) for years,' which I know she had. She said 'I can go down town and buy my sister Rose a dress with this money. It isn't much but it is something.' She said 'You are independent. You don't have to go to them and ask for a dollar if everything is in your name.' I said I thought matters of finance should be fifty-fifty between husband and wife, and she said no, *I had a lot to learn, that men had to be controlled and handled* and that way they can't leave you high and dry *if you have everything in your own name."* (Our emphasis.)

Another portion of the same witness' testimony was:

"Q. Did your aunt in those conversations state how long she had been conducting their business in that manner?

"A. For years. She said she had always done that, starting in right after they were married, and she said, 'You be sure and do the same thing. If you don't start it right at the beginning you won't be able to later on. You start out right that way.' She considered that method correct, the right way of doing, and she said 'If you start out that way you can keep it that way, but if you start out jointly it will be difficult to get him to turn everything over to you later on.' "

The same witness further testified:

"Q. Now did your aunt give you any instructions as to what you should do if you happened to be around and anything happened to her?

"A. Oh, yes. She told me if ever she became quite ill or if she died to be sure and take these keys, and she handed or showed them to me so I would recognize them, and go upstairs—she had numerous trunks up there where she kept papers, letters, and evidences of all these stocks and bonds, and she said for me to get them and not let Mr. Langdon see them, that he didn't know about them and *she didn't want him to know about them* because she didn't want his relatives to know about them. She said the keys were in her purse or in the drawer of the sideboard, and showed me where she hid

them. She said *'You be sure to go up and get them and take them away, and don't let him see them.'*" (Our emphasis.)

Insofar as now material the testimony of John P. Fritton was, in substance, as follows:

He was the executor of Mrs. Langdon's estate; his wife was a beneficiary under the will; Mrs. Langdon left all of her papers, including the securities in controversy, with him and Mrs. Fritton when she went to the hospital and the securities had been in their possession until the time of her death; he did not know what securities Mrs. Langdon had until her box was opened in the presence of her brother; he did not know why Mrs. Langdon had not left the securities with her husband but he believed she did not trust him; they had been having trouble the last four or five years; he did not believe Mr. Langdon had turned his entire earnings over to his wife; as executor he had taken possession of the Christmas savings account in the Central National Bank and had cashed certain designated certificates and bonds, some of which were issued in 1924.

The executor was further asked and said:

"Q. You don't know any reason why she didn't deliver those to her husband when she left there?

"A. There was one thing about it, I suppose. Mrs. Langdon was a conservative woman and she knows that Mr. Langdon, just like my daughter said, he was liberal. She knowed Mr. Langdon was always talking about a pension the last eight or ten years, she was trying to build up a reserve, so if he couldn't work *they* would have something to go on. If she hadn't done that I am sure *they* wouldn't have had all those stocks and bonds.

"Q. You think her accumulating all these securities and putting them in her own name and willing them to somebody else would have helped him in his old age?

"A. *They* wouldn't have had them if she hadn't done it." (Our emphasis.)

The list of securities was introduced.

We come now to a consideration of testimony of Mr. Langdon which was objected to by appellants. Some small notebooks in Langdon's own handwriting, containing entries of amounts he had received as salary and for services in his orchestra on dates entered by him at the time they were delivered to Mrs. Langdon, were introduced in evidence. The notebooks contained various notations differing slightly in language but were all to the general effect that he had given his salary check, or certain amounts from orchestra earnings, or from insurance, to his wife to be deposited in their joint bank account. The notations that he had given these amounts

to his wife to be so deposited were objected to on the grounds Langdon was an incompetent witness under the provisions of G. S. 1935, 60-2804, to testify relative to transactions or communications had with a deceased person and that he was an incompetent witness under the provisions of G. S. 1935, 60-2805, to testify concerning any communications between husband and wife. Only the first ground is urged now. The court reserved its ruling but overruled the objection at the close of appellee's case in chief. A statement by Langdon, made separate and apart from the notebook entries, that he had told his wife to pay their bills and buy stocks and bonds, was objected to by appellants and was sustained. With respect to the book account notations to the effect that he had given the money to Mrs. Langdon to deposit in the bank, he testified he did not thereafter change those instructions to Mrs. Langdon. There was no evidence Mrs. Langdon had ever seen the notebooks. The notebooks were merely his own record.

Langdon was cross-examined relative to these notebooks subject, however, to the objections previously noted. He testified he trusted his wife in every way and turned his money over to her; he left all business matters to her; he gave her the money to invest in stocks and bonds after paying their bills; he gave her the money but he could not say he knew she had invested it in securities for the reason that she kept the securities locked up; he only discovered the list of securities after he found them in her trunk.

Assuming the notations in Langdon's notebooks were improperly admitted under the rule stated in the case of *In re Estate of Badger,* 156 Kan. 734, 137 P. 2d 198, and the numerous cases therein discussed, relied on by appellants, we fail to see how that particular testimony was prejudicial in this case. Langdon was not merely cross-examined relative to the notebook notations. As a part of Langdon's cross-examination appellants introduced a new exhibit of their own, exhibit 2, which consisted of ledger sheets of the joint checking account in the National Bank of Topeka. They disclosed Langdon's semimonthly pay checks had been deposited as indicated in his notebooks. It would therefore appear the admission of the notations in his notebooks was not prejudicial. In *State, ex rel., v. Strevey,* 138 Kan. 646, 27 P. 2d 253, it was held:

"Where testimony for plaintiff of challenged competency was followed by the introduction of testimony on the same subject by defendant in his own behalf, whatever error may have inhered in the admission of evidence was thereby cured, following *State v. Furney,* 41 Kan. 115, 21 Pac. 213." (Syl. ¶ 2.)

Moreover, as previously indicated, there was other convincing evidence that appellee's earnings were used by Mrs. Langdon in the purchase of the securities.

Appellants argue appellee's claim is based on a pleaded "agreement and understanding" that Mrs. Langdon was to invest Mr. Langdon's earnings in securities after paying their living expenses. They contend no such agreement or understanding was established. We cannot agree. It is true no express written agreement was shown but that was unnecessary. Parties may be bound as firmly by implied contracts as by those expressed in words, oral or written. The law implies, from circumstances and the silent language of men's conduct and actions, contracts and promises as forcible and binding as those made by express words or through the medium of written memorials. (*Rains v. Weiler,* 101 Kan. 294, 166 Pac. 235; *Curtis v. Hanna,* 143 Kan. 186, 53 P. 2d 795; *Yeager v. Graham,* 150 Kan. 411, 94 P. 2d 317; 1 Addison on Contracts, 8th ed., p. 54; Restatement, Contracts, § 5, comment a.)

That the evidence on behalf of appellee established a confidential relation pursuant to which Mrs. Langdon was entrusted with her husband's earnings for the purpose of investing portions thereof in securities, that she breached the confidence reposed and had such securities issued in her own name, was established. That under these circumstances a trust arose in her husband's favor by implication of law is also well established. (*Staab v. Staab,* 158 Kan. 69, 73, 145 P. 2d 447, and cases therein cited.)

The securities are personalty and it, of course, is not contended the transaction was void under the statute of frauds. The testimony of Cecilia Whittenburg, a disinterested witness, disclosed: Mrs. Langdon' was entrusted by her husband with their business affairs and with the making of all investments; she invested part of her husband's salary in securities from the time they were married in 1919; she did not advise her husband in what securities she had invested; Mrs. Langdon had admonished her not to divulge to Mr. Langdon that she had the securities; Mrs. Langdon directed her where she could find the keys to the trunk in which the securities were contained in the event of her illness or death and admonished her not to inform Mr. Langdon concerning them.

John P. Fritton testified that if Mrs. Langdon had not been in control of the investments "I am sure they wouldn't have had all those stocks and bonds." The important facts are she did have

control over their investments and at her death *they*, and not she, owned the securities.

It follows the trial court did not err in overruling appellants' demurrer to appellee's evidence.

It is true that some of appellants' evidence conflicted, at least in part, with that adduced by appellee. Appellee's rebuttal evidence was, however, also in part contrary to that adduced by appellants. We need not review that evidence. The trial court resolved whatever material conflict existed in favor of appellee. The court was convinced Langdon had confidence in his wife and that she deceived him by leading him to believe she was saving his earnings for his old age. There is ample evidence to support the trial court's conclusion.

Appellants contend the trial court erred in excluding their exhibits 3, 4 and 5 which were typewritten lists of the securities in controversy. At the top of each sheet appeared the following typewritten statement, to wit:

"Following is the list of shares, investment bonds of Mrs. Mildred Heise Langdon, owned and paid for by her before her marriage to Mr. Langdon."

There was some handwriting on the exhibits which was identified as being that of Mrs. Langdon. Counsel for appellee objected to the exhibits on the grounds they were incompetent, irrelevant and immaterial, not within the issues of the case and self-serving declarations.

Appellants concede the statement on the exhibits purporting the securities were owned and paid for by Mrs. Langdon before her marriage was a self-serving declaration. They contend, however, the testimony was admissible to contradict the testimony of Cecilia Whittenburg to the effect that Mrs. Langdon told her she had purchased securities with Mr. Langdon's income and cite *Gordon v. Munn*, 87 Kan. 624, 125 Pac. 1; *Trustees of Baker University v. Farrar*, 134 Kan. 722, 8 P. 2d 343. The decisions do not support the contention. If other witnesses had testified to statements made by Mrs. Langdon contrary to those made by her to Mrs. Whittenburg the legal question would be closer to that ruled in the cases cited but that was not the situation here. The Gordon case pertains to the admissibility of evidence relating to the mental attitude or intent of a deceased after the living spouse had offered evidence of witnesses bearing on the question of the intent of the deceased to cancel an antenuptial contract. In the Farrar case it was held

that where statements of a deceased person are offered in evidence tending to prove that the deceased intended to make a contribution to a university, the adverse party may then offer in evidence declarations and conduct of the deceased person showing a contrary purpose.

In the instant case the testimony stricken was not that of a disinterested witness designed to show the intent of Mrs. Langdon but it was self-serving statement of a deceased, Mrs. Langdon, designed to prove title to the securities in controversy. The competent testimony of Mrs. Whittenburg did not make competent the incompetent self-serving declaration of Mrs. Langdon which appeared on the exhibits.

A careful examination of all cases relied on by appellants does not justify a reversal of the judgment in this case.

The judgment is affirmed.

HARVEY, C. J., and COWAN, J., not participating.