NOT DESIGNATED FOR PUBLICATION

No. 122,199

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DENNIS T. JOHNSON,
*Appellee*,

v.

J & S SCALES, INC.,
and
JOHN P. REBANT,
*Appellants*,

and

J & S WEIGHING SOLUTIONS, LLC,
and
MARJON, LLC,
*Defendants*.

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed December 23, 2020. Affirmed.

*David E. (Rick) Roberts*, of Hutchinson, for appellants.

*Gregory D. Bell*, of Bell and Robinson LLC, of Hutchinson, for appellee.

Before HILL, P.J., BRUNS and SCHROEDER, JJ.

PER CURIAM: Kansas courts have long allowed parties to be bound by a contract for goods through their course of dealing and performance. J & S Scales, Inc. (J & S Scales) and its owner, John P. Rebant, wanted to buy Dennis T. Johnson's business, J & S

1

Scale Fabricators, Inc. (J & S Fabricators). J & S Scales and Rebant now appeal the district court's decision granting Johnson a joint and several judgment of $94,182 for conversion and breach of contract against them, arguing the district court erred in finding the parties created an enforceable consignment contract for the unpaid portion of the inventory at closing. Upon careful review of the record, we agree with the district court's finding there was a binding contract between the parties for J & S Scales to take the extra inventory on consignment. We observe no error by the district court, and we affirm its judgment.

FACTS

Johnson created J & S Fabricators to design, manufacture, and sell livestock, truck, and bulk weighing scales. In 2008, Johnson decided to sell the business with the assistance of a broker. In 2009, Johnson's broker introduced him to Rebant, the president of J & S Scales, a company Rebant formed for the purpose of buying J & S Fabricators. Johnson and Rebant extensively negotiated the sale of the business between 2009 and 2011. During this time, J & S Fabricators continued to manufacture scales. On June 3, 2010, J & S Fabricators and Johnson, individually, executed an asset sale and purchase agreement (the sales contract), whereby J & S Scales agreed to purchase the assets of J & S Fabricators. Relevant to the issues on appeal are Paragraphs 1, 3, 4, and 21 of the sales contract.

Paragraph 1 provided:

"SALE AND ASSIGNMENT OF ASSETS. Sellers agree to sell, transfer and assign to Buyer all of Sellers' right, title and interest in and to the tangible and intangible personal property of Sellers' Business, including all the Intangible Property Rights and all Sellers' inventory, machinery, equipment, trade fixtures, tools, office furniture, vehicles, computers, computer software and designs, product designs, designs in process, discontinued designs, prints, manufacturing jigs, replacement and maintenance parts,

2

books and records (other than the corporate minute book and stock ledger and corporate tax records), permits, equipment leases, licenses, contracts with suppliers and customers, royalty agreements, endorsement agreements, patents, trademarks, service marks, trade names, telephone and facsimile numbers, domain sites, web sites, goodwill, customer lists, and customer files (collectively referred to herein as the 'Assets'), but excluding Sellers' cash and cash deposits, cash escrows and accounts receivable and the inventory Buyer does not accept at Closing (referred to herein as the 'Rejected Inventory')."

Paragraph 3 provided:

"PURCHASE PRICE. For and in consideration of the selling, transferring and assigning the Assets to Buyer and Sellers' agreements in the Consulting and Non-Compete Agreement, Buyer agrees to pay to Sellers Two Hundred Fifty Thousand Dollars ($250,000.00) at Closing (referred to herein as the 'Fixed Payment'); and an additional amount agreed upon in writing by Sellers and Buyer at or prior to Closing for Sellers' inventory, excluding the Rejected Inventory (referred to herein as the 'Agreed Value of Inventory'). $100,000.00 of the Fixed Payment shall be allocated to the Intangible Property Rights, $50,000.00 of the Fixed Payment shall be allocated to the Consulting and Non-Compete Agreement, and the remaining $100,000.00 of the Fixed Payment shall be allocated to the remaining tangible assets."

Paragraph 4 provided:

"TRANSFER OF ASSETS. At Closing, Sellers, contemporaneously with the performance by Buyer of its obligations to be performed at Closing, shall deliver bills of sale (with full warranty of title), assignments, transfers of intellectual property (including the Patents and NTEP Certificates) and assignments of contracts, titles and other appropriate instruments of transfer, all in form and substance reasonably satisfactory to Buyer's counsel, and as shall be sufficient to convey and transfer to Buyer the Assets and all of the right, title and interest of Sellers therein, free and clear from all liabilities, liens, restrictions and encumbrances of whatever nature."

Paragraph 21 provided:

"ENTIRE AGREEMENT. This Agreement and the Exhibits attached hereto, together with the Agreements referenced in the attached Exhibits, all of even date herewith, contain the entire understanding between the parties hereto and supersede any prior or contemporaneous, written or oral agreements between them respecting the within subject matter. There are no representations, agreements, arrangements or understandings, oral or written, between the parties hereto relating to the subject matter of this Agreement which are not fully expressed herein or therein. The terms and provisions of any prior agreements between Sellers and Buyer are superseded by this Agreement. Any amendments to this Agreement shall be in writing, signed by the parties hereto."

Johnson believed Paragraph 3 of the agreement required J & S Scales to pay an amount to be determined at the time of closing for J & S Fabricators' inventory, as J & S Fabricators was continuing to purchase material and manufacture inventory through the date of closing. The sales contract specified a closing date of July 30, 2010. However, closing had to be postponed because Rebant had difficulty obtaining financing. Johnson agreed to extend the closing as needed to allow Rebant to obtain financing. On October 5, 2010, Rebant obtained a loan guaranteed by the Small Business Administration (the SBA loan) for $739,000. The SBA loan provided that only $300,000 of the loan proceeds would be designated toward the purchase of inventory.

In November 2010, J & S Fabricators' inventory had a value of approximately $416,000. Because the cost of the inventory exceeded his available funds, Rebant needed to reach an agreement with Johnson to purchase all of J & S Fabricators' inventory. On November 26, 2010, Rebant sent Johnson an email proposing J & S Fabricators consign $116,052.89 of inventory to J & S Scales to make up the difference. The email stated, in pertinent part:

"I went through the inventory list, and I want to run this by you. Your current total value of inventory is $416,052.89. I will have $300,000 for inventory at the time of closing. In looking at your inventory, the majority of the dollars is in the Bulk Scale section (BL). I took some of the larger items (finished good items) and with just a handful of items, came up with just over $116,000.

"BL101003-000 10K BPH AIR OPER BULK SCALE (1) ea.  Total:  $20,254.29
"BL101005-000 20K BPH BULK SCALE 42" GATES (1) ea.  Total:  $28,146.88
"BL101010-000 2.5K BPH AUTOMATIC BULK SCALE (3) ea.  Total:  $42,110.64
"BL201001-008 AIR SUPPLY ASSEMBLY (4) ea.  Total:  $5,408.80
"BL201001-003 30 IN GATE COMPLETE [ASSEMBLY] (7) ea.  Total:  $20,571.88

"These items total $116,492.49.

"Subtracting this from your total inventory list $416,052.89, leaves $299,560.40.

"What I would propose is that the items listed above be consigned to us, and we will pay you as they are sold. We will buy the remaining inventory for $299,560.40. We may have to adjust this a little bit, as if I understood you correctly, you have almost $15,000 of inventory that was coming from Travis, and was not included in your inventory listing. If that is the case, we would need to find another $15,000 to add to your consigned inventory.

"Let me know if this sounds reasonable, or if you have any other suggestions. This seems to be a clean way of tracking what we would still owe you."

Johnson spoke with Rebant regarding the proposal in his email. Johnson did not want to consign specific pieces of inventory, although he and Rebant agreed the items specified in Rebant's email would likely be the first to sell. The parties agreed the value of the inventory was approximately $420,000 at the time of closing. Johnson agreed to consign inventory—although not specific items—from which Rebant would pay him the $120,000 difference between the amount allocated under the SBA loan ($300,000) and the value of the inventory at closing. In other words, Johnson wanted to be paid back as

soon as the inventory sold, irrespective of the items sold. Rebant, by his conduct, accepted Johnson's response to his offer.

On February 1, 2011, Rebant and his wife, the sole stockholders of J & S Scales, executed a stockholders' agreement which stated, in part:

"RESOLVED, that J & S Scales, Inc. will honor the aforementioned Asset Sale and Purchase Agreement, and will purchase the assets at the earliest date possible, pending requirements set forth in this agreement.

"RESOLVED FURTHER, that J & S Scales, Inc. will also purchase $300,000 worth of Inventory from J & S Scale Fabricators, with the remaining Inventory (approximately $120,000) being consigned, as agreed to by the buyer and seller."

Closing occurred on February 11, 2011. At closing, Johnson and Rebant executed a bill of sale, which provided, in pertinent part:

"For good, valuable and sufficient consideration, Dennis T. Johnson , d/b/a J & S Scale Fabricators, Inc., a Kansas Corporation (hereinafter referred to as 'SELLER') transfers, sells, conveys, warrants and assigns to J & S Scales, Inc., a Kansas Corporation (hereinafter referred to as 'BUYER'), pursuant to the Asset Purchase Agreement between the parties dated June 8, 2010, the following:

"a. All of Seller's furniture, fixtures, and equipment.
"b. All of Seller's goodwill."

Johnson did not include inventory in the bill of sale because that was a separate item for which Rebant agreed to pay $300,000 at closing and $120,000 from sales of the consigned inventory. On February 10, 2011, J & S Scales remitted a check for $300,000 to J & S Fabricators for "Inventory." On July 13, 2011, J & S Scales sent a check to Johnson, via Johnson's broker, for $19,318. The memo line on the check indicated it was

6

for "Inventory." On September 22, 2011, J & S Scales paid $5,000 to Johnson, via Johnson's broker, although there is no notation on the memo line of the check. At trial, Rebant claimed the postclosing payments were gifts to Johnson, not payments for inventory.

Johnson did not receive any further payments. At some point, Johnson and his attorney sent Rebant letters inquiring about the consigned inventory. On October 3, 2015, Rebant sent Johnson a letter stating, in pertinent part:

> "I received your letter, along with the letter from your attorney regarding the consigned inventory. I apologize for the delay in responding to this.

> "There appears to be a discrepancy in regards to the value of the inventory in question. I have a complete inventory printout you gave me at closing, showing an inventory value on February 8, 2011 of $398,342. We paid for $300,000 of inventory at closing, which would leave a balance of $98,342.

> "Contrary to the claim in the letters, we have made payments so far of $19,318. These payments were made to the escrow attorney for Sunbelt. We will pull these records this week and forward them to you.

> "We are in the process of moving all of our inventory records to a new inventory accounting database. As part of this process, we will also do a complete physical inventory count of our current inventory. I am asking for additional time to provide this information to you, so we can complete this process and have an accurate report. I can give you a complete accounting of the inventory when this switch over is complete, which should be in the next 30-45 days.

> "I will send you more information as soon as we pull it together."

Between the time of closing and Johnson filing suit, Johnson and Rebant had several discussions, mostly via telephone, about Johnson not being paid for the consigned

inventory. In those discussions, Rebant never told Johnson he believed the inventory had not been consigned. Rebant never told Johnson that J & S Scales did not owe Johnson for the consigned inventory or the inventory could not be sold. Rather, he attributed the nonpayment to cashflow issues. At trial, Rebant admitted he had nothing in writing to support his claim the inventory had not been consigned.

In June 2016, Rebant formed two new companies, J & S Weighing Solutions, LLC (J & S Weighing), and Marjon, LLC. In August 2016, J & S Scales and J & S Weighing executed an asset purchase agreement to sell all of J & S Scales' assets, including the inventory previously transferred from J & S Fabricators, to J & S Weighing. Those assets were later transferred from J & S Weighing to Marjon.

Johnson filed suit against Rebant, J & S Scales, J & S Weighing, and Marjon, alleging claims for breach of contract, breach of fiduciary duty, conversion, and unjust enrichment. The district court held a bench trial at which Johnson and Rebant both testified. After considering the evidence, the district court denied Johnson's claim for breach of fiduciary duty, finding no special relationship or confidences existed between Rebant and Johnson. With respect to the inventory, the district court found:

> "The contract for the sale of the company was signed in June of 2010. Closing did not occur until February 2011. The delay in closing was precipitated by the difficulty Defendant J & S Scales had in securing financing.

> "In November [2010], Defendant Rebant sent an email to Plaintiff indicating they had secured $300,000.00 for purchase of $416,052.89 of inventory. Rebant proposed consigning $116,492.49 of the larger items of inventory. Upon sale of the items by Defendant J & S Scales, the unpaid portion of the inventory would be paid.

> "On February 1, 2011, J & S Scales stockholders gave written consent to the consignment proposal of Defendant Rebant. The closing on the sales occurred on February 11, 2011.

8

"Defendant J & S Scales made two payments on the consignment sales with a balance remaining of $94,182.00.

"In the summer of 2016, J & S Scales sold their assets to Defendants J & S Weighing Solutions and MarJon LLC.

"At trial, Defendant Rebant testified the inventory in question had been purchased in 2011 and not taken in on [consignment]. Plaintiff testified to the contrary. The Court finds the testimony of Plaintiff to be credible. The evidence was overwhelming that an agreement was reached between Plaintiff and J & S Scales to consign the inventory in question to Defendant J & S Scales. The consignment was done at the request of Rebant with Plaintiff agreeing to the proposal as an accommodation to John Rebant and J & S Scales.

"The evidence also establishes in the summer of 2016 the inventory in question was transferred to the Defendants J & S Weighing Solutions and MarJon LLC by Defendant J & S Scales. The transfer of assets may have been partly to deal with the Small Business loan and other financial issues. The Court also finds a reason for the transfer was in reaction to Plaintiff seeking payments on the rest of the consigned inventory."

The district court held all named defendants—Rebant and the three defendant companies acting through him—were aware of, participated in, and were, therefore, liable for conversion of Johnson's property in the summer of 2016. The district court further held there was no valid claim for unjust enrichment against any of the named defendants. Regarding the breach of contract claim, the district court held:

"The Court finds substantial compliance was made with the terms of the contract. The Court has no question an agreement was reached between Plaintiff and Defendant J & S Scales in relation [to] the consignment of $120,000.00 of equipment. The Court finds the email of November 26, 2010 and the February 1, 2011 written consent of the stockholders of J & S Scales satisfies the terms of the contract to make the consignment binding upon the parties.

"Judgment is granted to Plaintiff against Defendant J & S Scales on the breach of contract claim in the amount of $94,182.00."

Rebant and J & S Scales timely appealed. Additional facts are set forth as necessary herein.

ANALYSIS

On appeal Rebant claims there was no meeting of the minds and no agreement between the parties in writing as required by the sales contract to support the consignment of the inventory not paid for at the closing. Johnson responds the parties' actions reflect by their course of dealing and performance the oral agreement for the consignment of the inventory.

*Standard of Review*

An appellate court exercises unlimited review over the interpretation and legal effect of written instruments and is not bound by the lower court's interpretations or rulings. *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016). "'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction. [Citations omitted.]'" *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015).

"'An interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. [Citations omitted.]'" *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013).

Normally, whether a contract exists is a question of fact. *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012). An appellate court reviews a district court's finding that a contract exists for substantial competent evidence. *Price v. Grimes*, 234 Kan. 898, 904, 677 P.2d 969 (1984); *Source Direct, Inc. v. Mantell*, 19 Kan. App. 2d 399, 407, 870 P.2d 686 (1994). Other issues in contract law amount to issues of fact subject to the substantial competent evidence standard. See *Stover v. Superior Industries Int'l, Inc.*, 29 Kan. App. 2d 235, 237-39, 29 P.3d 967 (2000). Substantial competent evidence is legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). "In evaluating the evidence to support the district court's factual findings, an appellate court does not weigh conflicting evidence, evaluate witnesses' credibility, or redetermine questions of fact. A court ordinarily presumes that the district court found all facts necessary to support its judgment. [Citations omitted.]" *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009).

To the extent the parties' arguments also require us to interpret statutes, they present questions of law subject to unlimited review. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019).

*Discussion*

The district court found a contract existed to cover the consigned inventory based on:

- the email from Rebant to Johnson proposing consignment of the inventory to pay for the portion not covered by the SBA loan;
- Johnson's testimony he orally agreed to consign inventory;

11

- the stockholder agreement of J & S Scales signed by Rebant and his wife to consign a portion of J & S Fabricators' remaining inventory on behalf of Johnson;

- Johnson's testimony he received some consignment payments from Rebant; and

- the district court's finding—contrary to Rebant's testimony—the two payments of $19,318 and $5,000 were for the consigned inventory, not gratuitous gifts to Johnson.

The district court held the consignment agreement was in "substantial compliance" with the terms of the sales contract and the long-running negotiations for Rebant to buy the business and its inventory. The district court's conclusion may simply be a matter of inartful wording; it may have said substantial compliance—rather than substantial competent evidence—when it found a binding implied-in-fact agreement existed. Nevertheless, we find the district court's decision is supported by substantial competent evidence, and we can uphold the district court's decision as right, even for a wrong reason. See *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015).

*The parties formed an implied-in-fact consignment agreement.*

Johnson persuasively argues an implied-in-fact contract was formed for the consignment of inventory. "Kansas courts recognize that parties may become contractually obligated by their conduct as well as by their use of oral or written words. Evidence of a contract implied in fact shows a mutual intent to contract. [Citations omitted.]" *Hall v. Kansas Farm Bureau*, 274 Kan. 263, 273, 50 P.3d 495 (2002).

"Parties may be bound as firmly by implied contracts as by those expressed in words, oral or written. The law implies, from circumstances and the silent language of men's conduct and actions, contracts and promises as forcible and binding as those made by express

words or through the medium of written memorials. [Citations omitted.]" *In re Estate of Langdon*, 165 Kan. 267, 274, 195 P.2d 317 (1948).

These same principles are recognized by Kansas statute—parties may create an enforceable contract for goods, i.e., inventory, through a course of performance.

"(a) A 'course of performance' is a sequence of conduct between the parties to a particular transaction that exists if:

(1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

(2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." K.S.A. 2019 Supp. 84-1-303(a).

Here, this implied-in-fact contract is supported by oral and written words and through action, i.e., performance. The written portions giving rise to the agreement are clear on their face—Rebant sent Johnson an email proposing consignment of the inventory, and Rebant and his wife signed a stockholders' agreement recognizing the inventory consignment agreement. The district court's factual findings reflect Johnson orally agreed to the consignment of inventory. The district court's acceptance of Johnson's testimony and specific rejection of Rebant's assertion the payments to Johnson were merely gifts reflect the district court found Johnson's testimony to be more credible than Rebant's. Accordingly, we cannot reweigh the evidence or the district court's credibility findings. See *Hodges*, 288 Kan. at 65.

With respect to a course of performance, Rebant sent Johnson the email proposing consignment of the inventory. After Johnson orally agreed to consignment, Rebant presented to Johnson a stockholders' agreement prepared at Johnson's request, which Rebant and his wife then signed. Rebant also made payments to Johnson of $19,318 and $5,000. The memo line of the check for $19,318 indicated it was for "Inventory." Rebant

13

also recognized the consigned inventory in a letter he sent in October 2015 to Johnson. Rebant never disputed inventory had been consigned; rather, he indicated there may have been some discrepancy in the total value of the inventory. Rebant testified he did not have any correspondence in which he questioned whether the inventory was consigned. And Rebant further admitted he never disputed the existence of a consignment agreement until after Johnson filed suit.

We observe multiple points of performance by Rebant—drafting and signing the stockholders' agreement, accepting the inventory at closing, making payments to Johnson as the consigned inventory was sold, and his later letter to Johnson acknowledging the consigned inventory. Rebant did not object to doing these things, although he did stop making payments for the inventory because money was tight. According to Johnson, Rebant told him this was due to cashflow issues, not because of a dispute as to whether a consignment agreement existed. And when Johnson inquired about further payments for the inventory, Rebant did not dispute it had been consigned; he merely questioned the total value of the inventory.

Rebant's actions reflect a course of performance. He could have refused to draft or sign the stockholders' agreement, could have rejected some or all of the inventory at closing, could have refused to make any payments, and/or could have denied the inventory had been consigned when Johnson asked about further payments, but he did not do so. The record shows he accepted the benefits of the agreement and voiced no objection until Johnson sought payment. Accordingly, the parties by their actions formed a binding implied-in-fact contract for Rebant to sell the consigned inventory and pay Johnson from the proceeds of the sales in order to satisfy the debt owed on the consigned inventory. See K.S.A. 2019 Supp. 84-1-303(a); *Hall*, 274 Kan. at 273; *In re Estate of Langdon*, 165 Kan. at 274.

*Rebant's interpretation of the sales contract leads to an absurd result.*

Rebant's arguments on appeal are unpersuasive. His primary argument is there could not be a valid consignment agreement for the inventory because the sales contract was never modified in writing. The problem with Rebant's argument is he essentially asks us to view one contract provision in isolation—specifically, Paragraph 21 of the sales contract. However, when interpreting contracts, we do not view provisions in isolation. Rather, contractual provisions should be interpreted and reconciled by looking to the contract as a whole. And we must interpret contracts in a reasonable manner to avoid absurd results. *Waste Connections of Kansas, Inc.*, 296 Kan. at 963. Rebant's argument is thoroughly undercut by Paragraph 3 of the sales contract, which states, in pertinent part: "Buyer agrees to pay to Sellers Two Hundred Fifty Thousand Dollars . . . at Closing . . . *and an additional amount agreed upon in writing by Sellers and Buyer at or prior to Closing for Sellers' inventory*." (Emphasis added.)

The sales contract clearly contemplated a separate agreement, i.e., purchase price, for J & S Scales to buy J & S Fabricators' inventory at or prior to closing. In fairness to Rebant, Paragraph 3 indicated such agreement was to be in writing, and there was no formal written agreement signed by both parties. But the parties' discussions and agreement regarding the inventory—the email from Rebant to Johnson and J & S Scales' stockholders' agreement—reflects their agreed upon value for the inventory at closing of approximately $420,000. Rebant only had $300,000 to allocate to the purchase of inventory, and the difference of approximately $120,000 would be made up by Rebant selling the consigned inventory and paying Johnson with the proceeds.

Rebant argues the district court erred in finding the consignment agreement had been reached in substantial compliance with the terms of the sales contract. Specifically, Rebant asserts Paragraph 21 contained no provision for substantial compliance; therefore,

15

no consignment agreement could have ever existed. Rebant asks us to take an all-or-nothing approach in construing the sales contract.

There is no evidence Rebant sought to modify the sales contract to reject J & S Fabricators' inventory value at any point prior to or at closing. Paragraph 3 clearly contemplated the sale and transfer of inventory at closing. It provided for the exclusion of "Rejected Inventory" from the total purchase price, and it contemplated an inventory value subject to change prior to closing and the necessity for a separate, agreed-upon value as a result thereof. It was also known by the parties that J & S Fabricators would continue doing business—to include buying, selling, and using its inventory—until the date of closing. Yet, the sales contract did not provide for the inventory to be valued as of the date the contract was signed—June 8, 2010—nor did it provide for the inventory to be valued at $300,000, which Rebant allocated toward the purchase of inventory at closing.

Rebant admits he paid $300,000 towards the inventory value at closing. But he offers no written agreement showing the $300,000 paid was for *all* of the inventory delivered to him at the closing. In essence, Rebant is trying to use Paragraph 21 of the sales contract as both a sword and a shield. His argument Johnson is entitled to nothing more for the inventory because there was no formal written agreement lacks support in the record. Furthermore, there is nothing in writing showing Rebant was entitled to all the inventory based on the $300,000 he paid at the closing. Rebant's argument, therefore, leads to an absurd result—one we cannot accept. See *Waste Connections of Kansas, Inc.*, 296 Kan. at 963.

*Rebant's response to Johnson's arguments lacks merit*.

Rebant filed a reply brief responding to Johnson's arguments. He asserts there cannot be an implied-in-fact contract based on a course of performance. Specifically, he

claims any course of performance had to have occurred after or under the agreement, and there was no subsequent performance because:

> "It is undisputed that JS Scales, after the ASSET AGREEMENT Closing, never sold any items of inventory pursuant to a consignment sale. In the absence of consignment sales, JS Scales did not engage in a 'sequence of conduct' or 'repeated occasions for performance'; therefore, none of the required elements of [K.S.A. 2019 Supp. 84-1-303](a)(1) and (a)(2) ever existed."

Rebant's argument is not supported by the evidence. The district court found: "J & S Scales made two payments on the consignment sales with a balance remaining of $94,182.00." We accept the district court's factual findings, and we will not weigh the evidence, determine credibility, or make independent factual findings. See *Hodges*, 288 Kan. at 65. Moreover, as previously explained herein, Rebant performed under the consignment agreement by delivering the stockholders' agreement signed by him and his wife and by making two payments. The record reflects multiple occasions where Rebant recognized the consignment and performed under the terms of the agreement.

Rebant next disputes Johnson's argument the consignment agreement was a supplement to the sales contract, not a modification of the contract. Rebant's argument generally lacks merit. Rebant asserts an agreement to consign the inventory materially altered or modified the sales contract because Paragraph 4 of the sales contract required transfer of all assets at closing "free and clear from all . . . restrictions and encumbrances." What Rebant fails to acknowledge is the earlier language in Paragraph 4, providing: "At Closing, Sellers, *contemporaneously with the performance by Buyer of its obligations to be performed at Closing*. . . ." (Emphasis added.) Those duties of the buyer included paying for seller's inventory at an agreed-upon price at closing. Based on the parties' testimony, the agreed-upon price was approximately $420,000.

17

To the extent the inventory was encumbered at closing, it was because Rebant could not pay for the entire value of the inventory and proposed the consignment as a means of making up for the shortfall in his financing. The consignment agreement allowed Rebant to have all of the inventory immediately available to him to sell. Rebant's argument on this point is disingenuous at best. Rebant also ignores the language of Paragraph 14(c) of the sales contract, which states: "Buyer shall have performed and complied with all agreements, obligations and conditions required by this Agreement and all Exhibits attached hereto to be performed or complied with on or prior to the date of Closing." Paragraph 3 required payment of "an additional amount agreed upon in writing by Sellers and Buyer at or prior to Closing for Sellers' inventory." Nothing in Paragraph 3 required this agreement to be drafted by either party; thus, completing a written agreement for the purchase of inventory was an obligation equally applicable to Rebant and Johnson. Yet, Rebant now unilaterally faults Johnson for not reducing the agreement to writing. Based on the language of Paragraph 3, Paragraph 4, and Paragraph 14(c), Johnson did not have an obligation to transfer the entirety of his inventory unencumbered when Rebant had insufficient loan funds to pay for all of the inventory at closing.

Rebant's argument the sales agreement entitled him to unencumbered transfer of Johnson's inventory based upon what was or, more pertinently, was not agreed to in writing lacks merit. There is no writing establishing Rebant was entitled to all of Johnson's inventory for $300,000. In very plain terms, Rebant wants to have his cake and eat it too. His argument on this point lacks credibility as a matter of fact and law.

Rebant further argues a valid consignment agreement could not exist because Johnson never agreed to the consignment of specific pieces of inventory. Rather, Johnson wanted to be paid the $120,000 from all the initial inventory sales, regardless of which inventory items were sold. Again, Rebant's argument seems rather disingenuous. In his email, Rebant proposed consigning specific items of inventory with a value of approximately $116,000. However, Johnson testified he did not want to wait for specific

items to be sold in order to be paid and he and Rebant agreed in their verbal discussions Johnson would be paid $120,000 from the initial inventory sales. Rebant's testimony and actions reflect he agreed to "Johnson's consignment solution whereby no specific items of inventory would be designated for consignment purposes."

Without citation to authority, Rebant claims:

"A consignment occurs when the seller retains title to identifiable goods which are then physically transferred to a second party for subsequent sale to a third party purchaser. As such, title to the consigned goods remain[s] with the seller and [is] not transferred to the second party. By Mr. Johnson's testimony, the Parties never agreed that specific items of inventory would be subject to consignment; therefore, when Mr. Johnson handed the Final Inventory to Mr. Rebant at the time of Closing, as per the provisions of ¶1 and ¶4 of the ASSET AGREEMENT, all of the right, title and interest with respect to all of the inventory was transferred to JS Scales at that time."

First, Rebant's argument is flawed because he fails to support his point with citation to pertinent authority, which is akin to failing to brief the issue. See *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018). Second, as previously discussed herein, Rebant has not shown he was entitled to the entirety of the inventory under the terms of the sales contract. There was no agreement—written or otherwise—for Rebant to receive all inventory for $300,000. In the bill of sale signed on the date of closing, Johnson indicated he was transferring to Rebant "[a]ll of Seller's furniture, fixtures, and equipment [and] [a]ll of Seller's goodwill" pursuant to the sales contract. Nothing in the record establishes Johnson transferred unencumbered title of his inventory to Rebant at closing. As provided in Paragraphs 1, 3, and 4 of the sales contract, Rebant had to pay Johnson for the value of the inventory at closing, but the inventory Rebant wanted exceeded his loan proceeds available to pay for the inventory. Thus, he only received title to the inventory he actually paid for. The evidence establishes Rebant paid for some, but not all, of Johnson's inventory and agreed to pay him for the remainder—

19

$120,000—through sale of the inventory. This is reflected in the stockholders' agreement signed by Rebant and his wife, his letter to Johnson, and Johnson's testimony at trial.

Rebant next argues Johnson improperly briefed his claims Rebant took advantage of an oral modification of the sales contract when the parties agreed to extend the closing date to accommodate Rebant's financing issues. Johnson is just pointing out the obvious—Rebant wanted to extend the contract closing until he obtained the financing he needed to buy the business from Johnson. However, this point is largely tangential, and we will not dwell on it.

Finally, Rebant takes issue with what he characterizes as a "fraud allegation" by Johnson. Johnson did not plead a claim of fraud in this action. In his brief, Johnson asserts: "Mr. Rebant and J & S Scales [are] attempting to use the statute of frauds to commit a fraud upon Mr. Johnson to obtain $94,182.00 of inventory for free." While Johnson uses the word "fraud," it is clear from reading the brief he is referring to an inequitable or unfair result. Johnson cites *Quaney v. Tobyne*, 236 Kan. 201, 209, 689 P.2d 844 (1984), for the proposition "the statute of frauds was enacted to prevent fraud *and injustice*, not to foster or encourage it, and a court of equity will not ordinarily permit its use as a shield to protect fraud *or to enable one to take advantage of his own wrong*." (Emphases added.)

Johnson's argument is sound. Rebant cannot accept consigned inventory, agree to it orally, sign a stockholders' agreement indicating the agreement existed, later send a letter acknowledging the consigned inventory, and make two payments on the consigned inventory only to disavow the agreement years later when payment is requested. Moreover, as repeatedly stated herein, Rebant is unreasonably trying to use the contractual statute of frauds provision of Paragraph 21 as both a sword and shield. On the one hand, he asserts Johnson is entitled to nothing more than the $300,000 Rebant paid for the inventory because nothing more was agreed to in writing. But on the other hand,

20

Rebant claims he is entitled to unencumbered title to the inventory despite the fact no price—$300,000 or $420,000—had been agreed to in writing.

Rebant's arguments lack support in the record. Substantial competent evidence supports the district court's finding the parties agreed to an inventory value of $420,000 at the time of closing for which Johnson would receive $300,000 at closing and the remaining $120,000 would be paid to Johnson as Rebant sold the inventory. Based on Rebant's email to Johnson, Johnson's testimony regarding their subsequent discussions, Rebant presenting to Johnson the signed stockholders' agreement, Rebant's letter to Johnson, and the district court's finding Rebant made two payments to Johnson for consigned inventory, the parties formed a binding contract based on their course of dealing and performance for Rebant to take possession of the excess inventory at closing and pay Johnson as it was sold. There was substantial competent evidence to support the district court's judgment in the amount of $94,182.

Affirmed.